## HUGHES *v.* OKLAHOMA

No. 77–1439.  Argued January 9, 1979—Decided April 24, 1979

Brennan, J., delivered the opinion of the Court, in which Stewart, White, Marshall, Blackmun, Powell, and Stevens, JJ., joined. Rehnquist, J., filed a dissenting opinion, in which Burger, C. J., joined, *post*, p. 339.

*Robert M. Helton* argued the cause and filed a brief for appellant.

*Bill J. Bruce* argued the cause for appellee. With him on the brief was *Larry Derryberry,* Attorney General of Oklahoma.

Mr. Justice Brennan delivered the opinion of the Court.

The question presented for decision is whether Okla. Stat., Tit. 29, § 4–115 (B) (Supp. 1978), violates the Commerce Clause, Art. I, § 8, cl. 3, of the United States Constitution, insofar as it provides that "[n]o person may transport or ship minnows for sale outside the state which were seined or procured within the waters of this state . . . ."[1]

---

[1] Section 4–115 provides in full:

"A. No person may ship or transport minnows for sale into this state from an outside source without having first procured a license for such from the Director.

"B. No person may transport or ship minnows for sale outside the state

Appellant William Hughes holds a Texas license to operate a commercial minnow business near Wichita Falls, Tex. An Oklahoma game ranger arrested him on a charge of violating § 4–115 (B) by transporting from Oklahoma to Wichita Falls a load of natural minnows purchased from a minnow dealer licensed to do business in Oklahoma. Hughes' defense that § 4–115 (B) was unconstitutional because it was repugnant to the Commerce Clause was rejected, and he was convicted and fined. The Oklahoma Court of Criminal Appeals affirmed, stating:

"The United States Supreme Court has held on numerous occasions that the wild animals and fish within a state's border are, so far as capable of ownership, owned by the state in its sovereign capacity for the common

which were seined or procured within the waters of this state except that:

"1. Nothing contained herein shall prohibit any person from leaving the state possessing three (3) dozen or less minnows;

"2. Nothing contained herein shall prohibit sale and shipment of minnows raised in a regularly licensed commercial minnow hatchery.

"C. The fee for a license under this section shall be:

"1. For residents, One Hundred Dollars ($100.00);

"2. For nonresidents, Three Hundred Dollars ($300.00).

"D. Any person convicted of violating any provisions of this section shall be punished by a fine of not less than One Hundred Dollars ($100.00) nor more than Two Hundred Dollars ($200.00)."

The prohibition against transportation out of State for sale thus does not apply to hatchery-bred minnows, but only to "natural" minnows seined or procured from waters within the State.

Section 4–115 (B) is part of the Oklahoma Wildlife Conservation Code. Another provision of that Code requires that persons have a minnow dealer's license before they can lawfully seine or trap minnows within the State—except for their own use as bait—§ 4–116 (Supp. 1978), but no limit is imposed on the number of minnows a licensed dealer may take from state waters. Nor is there any regulation except § 4–115 (B) concerning the disposition of lawfully acquired minnows; they may be sold within Oklahoma to any person and for any purpose, and may be taken out of the State for any purpose except sale.

benefit of all its people. Because of such ownership, and in the exercise of its police power, the state may regulate and control the taking, subsequent use and property rights that may be acquired therein. *Lacoste* v. *Department of Conservation,* 263 U. S. 545 . . . ; *Geer* v. *State of Connecticut,* 161 U. S. 519 . . . . As stated in *Lacoste, supra,* protection of the wildlife of a state is peculiarly within the police power of the state, and the state has great latitude in determining what means are appropriate for its protection.

". . . Oklahoma law does not prohibit commercial minnow hatcheries within her borders from selling stock minnows to anyone, resident or nonresident, and minnows purchased therefrom may be freely exported. However, the law served to protect against the depletion of minnows in Oklahoma's natural streams through commercial exportation. No person is allowed to export natural minnows for sale outside of Oklahoma. Such a prohibition is not repugnant to the commerce clause . . . ." 572 P. 2d 573, 575 (1977).

We noted probable jurisdiction, 439 U. S. 815 (1978). We reverse. *Geer* v. *Connecticut,* 161 U. S. 519 (1896), on which the Court of Criminal Appeals relied, is overruled. In that circumstance, § 4–115 (B) cannot survive appellant's Commerce Clause attack.

I

The few simple words of the Commerce Clause—"The Congress shall have Power . . . To regulate Commerce . . . among the several States . . ."—reflected a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Con-

federation. See *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 533–534 (1949). The Commerce Clause has accordingly been interpreted by this Court not only as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation.[2] The cases defining the scope of permissible state regulation in areas of congressional silence reflect an often controversial evolution of rules to accommodate federal and state interests.[3] *Geer* v. *Connecticut* was decided relatively early in that evolutionary process. We hold that time has revealed the error of the early resolution reached in that case, and accordingly *Geer* is today overruled.

---

[2] "The Commerce Clause is one of the most prolific sources of national power and an equally prolific source of conflict with legislation of the state. While the Constitution vests in Congress the power to regulate commerce among the states, it does not say what the states may or may not do in the absence of congressional action, nor how to draw the line between what is and what is not commerce among the states. Perhaps even more than by interpretation of its written word, this Court has advanced the solidarity and prosperity of this Nation by the meaning it has given to these great silences of the Constitution." *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S., at 534–535.

*Philadelphia* v. *New Jersey,* 437 U. S. 617, 621–623 (1978), made clear that there is no "two-tiered definition of commerce." The definition of "commerce" is the same when relied on to strike down or restrict state legislation as when relied on to support some exertion of federal control or regulation.

[3] See, *e. g., Gibbons* v. *Ogden,* 9 Wheat. 1, 209 (1824); *Willson* v. *Black Bird Creek Marsh Co.,* 2 Pet. 245 (1829); *Cooley* v. *Board of Wardens,* 12 How. 299 (1852); *Port Richmond & Bergen Point Ferry Co.* v. *Board of Chosen Freeholders,* 234 U. S. 317 (1914); *Di Santo* v. *Pennsylvania,* 273 U. S. 34 (1927); *Parker* v. *Brown,* 317 U. S. 341 (1943); *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S. 761 (1945); *H. P. Hood & Sons, Inc.* v. *Du Mond, supra; Pike* v. *Bruce Church, Inc.,* 397 U. S. 137 (1970). See generally, F. Frankfurter, The Commerce Clause Under Marshall, Taney and Waite (1937); Dowling, Interstate Commerce and State Power, 27 Va. L. Rev. 1 (1940); Dowling, Interstate Commerce and State Power—Revised Version, 47 Colum. L. Rev. 547 (1947).

## A

*Geer* sustained against a Commerce Clause challenge a statute forbidding the transportation beyond the State of game birds that had been lawfully killed within the State.[4] The decision rested on the holding that no interstate commerce was involved. This conclusion followed in turn from the view that the State had the power, as representative for its citizens, who "owned" in common all wild animals within the State, to control not only the *taking* of game but also the *ownership* of game that had been lawfully reduced to possession.[5] By virtue of this power, Connecticut could qualify the ownership of wild game taken within the State by, for example, prohibiting its removal from the State: "The common ownership imports the right to keep the property, if the sovereign so chooses, always within its jurisdiction for every purpose." 161 U. S., at 530. Accordingly, the State's power to qualify ownership raised serious doubts whether the sale or exchange of wild game constituted "commerce" at all; in any event the Court held that the qualification imposed by the challenged statute removed any transactions involving wild game killed in Connecticut from *interstate* commerce.[6]

---

[4] "[T]he sole issue which the case presents is, was it lawful under the Constitution of the United States (section 8, Article I) for the State of Connecticut to allow the killing of birds within the State during a designated open season, to allow such birds, when so killed, to be used, to be sold and to be bought for use within the State, and yet to forbid their transportation beyond the State? Or, to state it otherwise, had the State of Connecticut the power to regulate the killing of game within her borders so as to confine its use to the limits of the State and forbid its transmission outside of the State?" 161 U. S., at 522.

[5] *Id.*, at 522–529. The Court has recognized that *Geer's* analysis of the authorities on this issue is open to question. *Toomer* v. *Witsell*, 334 U. S. 385, 402 n. 37 (1948).

[6] "The qualification which forbids [the game's] removal from the State necessarily entered into and formed part of every transaction on the subject, and deprived the mere sale or exchange of these articles of that element of freedom of contract and of full ownership which is an essential

Mr. Justice Field and the first Mr. Justice Harlan dissented, rejecting as artificial and formalistic the Court's analysis of "ownership" and "commerce" in wild game. They would have affirmed the State's power to provide for the protection of wild game, but only "so far as such protection . . . does not contravene the power of Congress in the regulation of inter-

---

attribute of commerce. Passing, however, as we do, the decision of this question, and granting that the dealing in game killed within the State, under the provision in question, created internal State commerce, it does not follow that such internal commerce became necessarily the subject-matter of interstate commerce, and therefore under the control of the Constitution of the United States.

.     .     .     .     .

". . . The power of the State to control the killing of and ownership in game being admitted, the commerce in game, which the state law permitted, was necessarily only internal commerce, since the restriction that it should not become the subject of external commerce went along with the grant and was a part of it." 161 U. S., at 530–532.

Our Brother REHNQUIST suggests that the Court in *Geer* offered as an "alternative basis for its decision" (in the final paragraph of its 15-page opinion) that the "State, in the exercise of its police power, could act to preserve for its people a valuable food supply, even though interstate commerce was remotely and indirectly affected." *Post,* at 340 n. 3. That this was not an "alternative basis," however, is made clear in a sentence not quoted by our Brother REHNQUIST:

"The power of a State to protect by adequate police regulation its people against the adulteration of articles of food, . . . although in doing so commerce might be remotely affected, necessarily carries with it the existence of a like power to preserve a food supply *which belongs in common to all the people of the State, which can only become the subject of ownership in a qualified way, and which can never be the object of commerce except with the consent of the State and subject to the conditions which it may deem best to impose for the public good."* 161 U. S., at 535 (emphasis added).

Thus, rather than an "alternative basis" independent of the "state ownership" and "no interstate commerce" rationales, this "preservation of a valuable resource" rationale was premised on those rationales. In any event, even if an "alternative basis," this rationale has met the same fate as *Geer's* primary rationale. See *infra,* at 329–331, and n. 9.

state commerce." [7]   Their view was that "[w]hen any animal . . . is lawfully killed for the purposes of food or other uses of man, it becomes an article of commerce, and its use cannot be limited to the citizens of one State to the exclusion of citizens of another State." [8]

## B

The view of the *Geer* dissenters increasingly prevailed in subsequent cases. Indeed, not only has the *Geer* analysis been rejected when natural resources other than wild game were involved, but even state regulations of wild game have been held subject to the strictures of the Commerce Clause under the pretext of distinctions from *Geer*.

The erosion of *Geer* began only 15 years after it was decided. A Commerce Clause challenge was addressed to an Oklahoma statute designed to prohibit the transportation beyond the State of natural gas produced by wells within the State. *West* v. *Kansas Natural Gas Co.*, 221 U. S. 229 (1911). Based on reasoning parallel to that in *Geer*, Oklahoma urged its right to "conserve" the gas for the use of its own citizens, stressing the limited supply and the absence of alternative sources of fuel within the State. Nevertheless, the Court, in a passage reminiscent of the dissents in *Geer*, condemned the obvious protectionist motive in the Oklahoma statute and rejected the State's arguments with a powerful reaffirmation of the vision of the Framers:

> "The statute of Oklahoma recognizes [gas] to be a subject of intrastate commerce, but seeks to prohibit it from being the subject of interstate commerce, and this is the purpose of its conservation. . . . If the States have such power a singular situation might result. Pennsylvania might keep its coal, the Northwest its timber, the mining

---

[7] 161 U. S., at 541 (Field, J., dissenting); see *id.*, at 543 (Harlan, J., dissenting).

[8] *Id.*, at 538, 541–542 (Field, J., dissenting); see *id.*, at 543–544 (Harlan, J., dissenting).

States their minerals. And why may not the products of the field be brought within the principle? Thus enlarged, or without that enlargement, its influence on interstate commerce need not be pointed out. To what consequences does such power tend? If one State has it, all States have it; embargo may be retaliated by embargo, and commerce will be halted at state lines. And yet we have said that 'in matters of foreign and interstate commerce there are no state lines.' In such commerce, instead of the States, a new power appears and a new welfare, a welfare which transcends that of any State. But rather let us say it is constituted of the welfare of all of the States and that of each State is made the greater by a division of its resources, natural and created, with every other State, and those of every other State with it. This was the purpose, as it is the result, of the interstate commerce clause of the Constitution of the United States. If there is to be a turning backward it must be done by the authority of another instrumentality than a court." 221 U. S., at 255–256.

The Court distinguished discriminatory or prohibatory regulations offensive to the Commerce Clause, such as the Oklahoma statute, from a valid "exercise of the police power to regulate the taking of natural gas" that was "universal in its application and justified by the nature of the gas and which allowed its transportation to other states." *Id.*, at 257; see *id.*, at 252–254 (distinguishing *Ohio Oil Co.* v. *Indiana*, 177 U. S. 190 (1900)).

In subsequent Commerce Clause challenges to state regulation of exports of natural resources, the *West* analysis emerged as the dominant approach. See, *e. g.*, *Pennsylvania* v. *West Virginia*, 262 U. S. 553, 598–600 (1923); [9] *H. P. Hood & Sons,*

---

[9] The inconsistency between the result in this case and that in *Geer* was not overlooked by the dissenting Justices. See *Pennsylvania* v. *West Virginia*, 262 U. S., at 601 (Holmes, J., dissenting). Significantly,

*Inc.* v. *Du Mond,* 336 U. S. 525 (1949). Today's principle is that stated in *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142 (1970):

> "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." (Citations omitted.)

This formulation was employed only last Term to strike down New Jersey's attempt to "conserve" the natural resource of landfill areas within the State for the disposal of waste generated within the State. *Philadelphia* v. *New Jersey,* 437 U. S. 617, 624 (1978).

The *Geer* analysis has also been eroded to the point of virtual extinction in cases involving regulation of wild animals. The first challenge to *Geer*'s theory of a State's power over wild animals came in *Missouri* v. *Holland,* 252 U. S. 416 (1920). The State of Missouri, relying on the theory of state ownership of wild animals, attacked the Migratory Bird Treaty Act on the ground that it interfered with the State's control over wild animals within its boundaries. Writing for the Court, Mr. Justice Holmes upheld the Act as a proper

---

our Brother REHNQUIST relies on this *dissent* in his discussion of the "alternative basis" of *Geer*—the "preservation of a valuable natural resource" rationale. See n. 6, *supra; post,* at 340–341, n. 3. The *Court* opinion in *Pennsylvania* v. *West Virginia,* like that in *West,* expressly rejected this argument along with the "no interstate commerce" rationale. 262 U. S., at 599–600.

exercise of the treatymaking power. He commented in passing on the artificiality of the *Geer* rationale: "To put the claim of the State upon title is to lean upon a slender reed." 252 U. S., at 434.

*Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S. 1 (1928), undermined *Geer* even more directly. A Louisiana statute forbade the transportation beyond the State of shrimp taken in Louisiana waters until the heads and shells had been removed.[10] The statute clearly relied on the *Geer* state-control-of-ownership rationale.[11] Anyone lawfully taking shrimp from Louisiana waters was granted "a qualified interest which may be sold within the State." Only after the head and shell

---

[10] The law challenged in *Foster-Fountain Packing Co.* was passed in July 1926. The state legislature may have been encouraged to take such action by certain language in *Lacoste* v. *Louisiana Dept. of Conservation,* 263 U. S. 545 (1924), language also relied on by the Oklahoma Court of Criminal Appeals in this case. *Lacoste* upheld a Louisiana "severance" tax on the skins of all wild furbearing animals and alligators taken in the State. The Court cited *Geer* for the proposition that:

"The wild animals within its borders are, so far as capable of ownership, owned by the State in its sovereign capacity for the common benefit of all of its people. Because of such ownership, and in the exercise of its police power the State may regulate and control the taking, subsequent use and property rights that may be acquired therein." 263 U. S., at 549.

Nevertheless, *Lacoste* expressly declined to uphold the tax "by virtue of the power of the State to prohibit, and therefore to condition, the removal of wild game from the State." *Ibid.* Rather than reach this issue, the Court upheld the measure as a valid police regulation designed to conserve and protect wild animals, noting that the tax applied to all skins taken within the State, whether kept within the State or shipped out. *Id.,* at 550–551. Thus, despite its citation of *Geer, Lacoste* is actually more compatible with the cases following the views of the Justices dissenting in *Geer.*

[11] The preamble to the Act read in part as follows: "To declare all shrimp and parts thereof in the waters of the State to be the property of the State of Louisiana, and to provide the manner and extent of their reduction to private ownership . . . ." *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S., at 5 n.

had been removed within the State did the taker or possessor acquire "title and the right to sell and ship the same 'beyond the limit[s] of the State, without restriction or reservation.' " 278 U. S., at 8.

Ignoring the niceties of "title" to the shrimp and concentrating instead on the purposes and effects of the statute, *Foster-Fountain Packing* struck down the statute as economic protectionism abhorrent to the Commerce Clause. The analysis resembled that employed in the natural gas cases, which were cited with approval, *id.*, at 10–11, 13.[12] *Geer* was distinguished on the ground that there "[n]o part of the game was permitted by the statute to become an article of interstate commerce." 278 U. S., at 12.[13] Limiting *Geer* to cases involving complete embargoes on interstate commerce in a wild animal created the anomalous result that the most burdensome laws enjoyed the most protection from Commerce Clause attack.

*Foster-Fountain Packing*'s implicit shift away from *Geer*'s formalistic "ownership" analysis became explicit in *Toomer* v. *Witsell*, 334 U. S. 385, 402 (1948), which struck down as violations of the Commerce Clause and the Privileges and

---

[12] The Court cited these cases for the proposition that "[a] State is without power to prevent privately owned articles of trade from being shipped and sold in interstate commerce on the ground that they are required to satisfy local demands or because they are needed by the people of the State." *Id.*, at 10.

[13] "As the representative of its people, the State might have retained the shrimp for consumption and use therein. . . . But by permitting its shrimp to be taken and all the products thereof to be shipped and sold in interstate commerce, the State necessarily releases its hold and, as to the shrimp so taken, definitely terminates its control. Clearly such authorization and the taking in pursuance thereof put an end to the trust upon which the State is deemed to own or control the shrimp for the benefit of its people. And those taking the shrimp under the authority of the Act necessarily thereby become entitled to the rights of private ownership and the protection of the commerce clause." *Id.*, at 13.

334

Immunities Clause certain South Carolina laws discriminating against out-of-state commercial fishermen:

> "The whole ownership theory, in fact, is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource. And there is no necessary conflict between that vital policy consideration and the constitutional command that the State exercise that power, like its other powers, so as not to discriminate without reason against citizens of other States."

Although stated in reference to the Privileges and Immunities Clause challenge, this reasoning is equally applicable to the Commerce Clause challenge.[14] *Douglas* v. *Seacoast Products, Inc.*, 431 U. S. 265 (1977), dispelled any doubts on that score. In rejecting the argument that Virginia's "ownership" of fish swimming in its territorial waters empowered the State to forbid fishing by federally licensed ships owned by nonresidents while permitting residents to fish, *Seacoast Products* explicitly embraced the analysis of the *Geer* dissenters:

> "A State does not stand in the same position as the owner of a private game preserve and it is pure fantasy to talk of 'owning' wild fish, birds, or animals. Neither the States nor the Federal Government, any more than a hopeful fisherman or hunter, has title to these creatures until they are reduced to possession by skillful capture. . . . *Geer* v. *Connecticut*, 161 U. S. 519, 539–540 (1896)

---

[14] See *Hicklin* v. *Orbeck*, 437 U. S. 518, 531–532 (1978). The Court distinguished *Geer* on the same basis used in *Foster-Fountain Packing* Co., 334 U. S., at 404–406. *Takahashi* v. *Fish & Game Comm'n*, 334 U. S. 410, 420–421 (1948), decided the same day as *Toomer*, reviewed the cases distinguishing and questioning *Geer* and found the State's claim to "ownership" inadequate to justify a ban on commercial fishing by alien residents.

(Field, J., dissenting). The 'ownership' language of cases such as those cited by appellant must be understood as no more than a 19th-century legal fiction expressing 'the importance to its people that a State have power to preserve and regulate the exploitation of an important resource.' [Citing *Toomer*.] Under modern analysis, the question is simply whether the State has exercised its police power in conformity with the federal laws and Constitution." 431 U. S., at 284.[15]

## C

The case before us is the first in modern times to present facts essentially on all fours with *Geer*.[16] We now conclude that challenges under the Commerce Clause to state regulations of wild animals should be considered according to the same general rule applied to state regulations of other natural resources, and therefore expressly overrule *Geer*. We thus bring our analytical framework into conformity with practical realities. Overruling *Geer* also eliminates the anomaly, created by the decisions distinguishing *Geer*, that statutes imposing the most extreme burdens on interstate commerce (essentially total embargoes) were the most immune from challenge. At the same time, the general rule we adopt in this case makes ample allowance for preserving, in ways not

---

[15] "In more recent years . . . the Court has recognized that the States' interest in regulating and controlling those things they claim to 'own,' including wildlife, is by no means absolute. States may not compel the confinement of the benefits of their resources, even their wildlife, to their own people whenever such hoarding and confinement impedes interstate commerce. *Foster-Fountain Packing Co.* v. *Haydel*, 278 U. S. 1 (1928); *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923); *West* v. *Kansas Natural Gas Co.*, 221 U. S. 229 (1911)." *Baldwin* v. *Montana Fish & Game Comm'n*, 436 U. S. 371, 385–386 (1978).

[16] See, *e. g.*, *Douglas* v. *Seacoast Products, Inc.*, 431 U. S. 265, 285 n. 21 (1977).

inconsistent with the Commerce Clause, the legitimate state concerns for conservation and protection of wild animals underlying the 19th-century legal fiction of state ownership.

## II

We turn then to the question whether the burden imposed on interstate commerce in wild game by § 4-115 (B) is permissible under the general rule articulated in our precedents governing other types of commerce. See, *e. g., Pike* v. *Bruce Church, Inc.,* 397 U. S., at 142, quoted, *supra,* at 331. Under that general rule, we must inquire (1) whether the challenged statute regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce. The burden to show discrimination rests on the party challenging the validity of the statute, but "[w]hen discrimination against commerce . . . is demonstrated, the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hunt* v. *Washington Apple Advertising Comm'n,* 432 U. S. 333, 353 (1977). Furthermore, when considering the purpose of a challenged statute, this Court is not bound by "[t]he name, description or characterization given it by the legislature or the courts of the State," but will determine for itself the practical impact of the law. *Lacoste* v. *Louisiana Dept. of Conservation,* 263 U. S. 545, 550 (1924); see *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S., at 10; *Pike* v. *Bruce Church, Inc., supra.*

Section 4-115 (B) on its face discriminates against interstate commerce. It forbids the transportation of natural min-

nows out of the State for purposes of sale, and thus "overtly blocks the flow of interstate commerce at [the] State's borders." *Philadelphia* v. *New Jersey*, 437 U. S., at 624. Such facial discrimination by itself may be a fatal defect, regardless of the State's purpose, because "the evil of protectionism can reside in legislative means as well as legislative ends." *Id.*, at 626.[17] At a minimum such facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives.

Oklahoma argues that § 4–115 (B) serves a legitimate local purpose in that it is "readily apparent as a conservation measure." Brief for Appellee 8. The State's interest in maintaining the ecological balance in state waters by avoiding the removal of inordinate numbers of minnows may well qualify as a legitimate local purpose. We consider the States' interests in conservation and protection of wild animals as legitimate local purposes similar to the States' interests in protecting the health and safety of their citizens. See, *e. g.*, *Firemen* v. *Chicago, R. I. & P. R. Co.*, 393 U. S. 129 (1968). But the scope of legitimate state interests in "conservation" is narrower under this analysis than it was under *Geer*. A State may no longer "keep the property, if the sovereign so chooses, always within its jurisdiction for every purpose." *Geer* v. *Connecticut*, 161 U. S., at 530. The fiction of state ownership may no longer be used to force those outside the State to bear the full costs of "conserving" the wild animals within its borders when · equally effective nondiscriminatory conservation measures are available.

Far from choosing the least discriminatory alternative,

---

[17] "[W]hatever [a State's] ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently." *Philadelphia* v. *New Jersey*, 437 U. S., at 626–627.

Oklahoma has chosen to "conserve" its minnows in the way that most overtly discriminates against interstate commerce. The State places no limits on the numbers of minnows that can be taken by licensed minnow dealers; nor does it limit in any way how these minnows may be disposed of within the State.[18] Yet it forbids the transportation of any commercially significant number of natural minnows out of the State for sale.[19] Section 4–115 (B) is certainly not a "last ditch" attempt at conservation after nondiscriminatory alternatives have proved unfeasible. It is rather a choice of the most discriminatory means even though nondiscriminatory alternatives would seem likely to fulfill the State's purported legitimate local purpose more effectively.[20]

We therefore hold that § 4–115 (B) is repugnant to the Commerce Clause.

### III

The overruling of *Geer* does not leave the States powerless to protect and conserve wild animal life within their borders. Today's decision makes clear, however, that States may pro-

---

[18] See n. 1, *supra.*

[19] Section 4–115 (B) does not apply to persons transporting three dozen or less natural minnows outside the State. See n. 1, *supra.*

[20] In its brief, Oklahoma argues, apparently for the first time, that the discrimination against out-of-state sales of natural minnows is justified because minnows purchased in the State are more likely to be used for bait in state waters. Brief for Appellee 3. The State contends that minnows "returned" to state waters as bait do not upset the ecological balance as much as those that never "return." The late appearance of this argument and the total absence of any record support for the questionable factual assumptions that underlie it give it the flavor of a *post hoc* rationalization. The State's bare assertion is certainly inadequate to survive the scrutiny invoked by the facial discrimination of § 4–115 (B). In any case, Oklahoma itself concedes that the "return" of natural minnows as bait is irrelevant to most aspects of preserving ecological balance. Brief for Appellee 4.

mote this legitimate purpose only in ways consistent with the basic principle that "our economic unit is the Nation," *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S., at 537, and that when a wild animal "becomes an article of commerce . . . its use cannot be limited to the citizens of one State to the exclusion of citizens of another State." *Geer* v. *Connecticut, supra,* at 538 (Field, J., dissenting).

*Reversed.*

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

This Court's seeming preoccupation in recent years with laws relating to wildlife must, I suspect, appear curious to casual observers of this institution.[1] It is no more curious, however, than this Court's recent pronouncements on the validity of *Geer* v. *Connecticut,* 161 U. S. 519 (1896). For less than one year ago we unreservedly reaffirmed the principles announced in *Geer. Baldwin* v. *Montana Fish & Game Comm'n,* 436 U. S. 371, 386 (1978). Today, the Court overrules that decision. Because I disagree with the Court's overruling of *Geer* and holding that Oklahoma's law relating to the sale of minnows violates the Commerce Clause, I dissent.

In its headlong rush to overrule *Geer,* the Court characterizes that decision as "rest[ing] on the holding that no interstate commerce was involved." *Ante,* at 327. It is true that one of the rationales relied on by the *Geer* Court was that the State could exercise its power to control the killing and ownership of animals *ferae naturae* to prohibit such game

---

[1] See, *e. g., TVA* v. *Hill,* 437 U. S. 153 (1978) (snail darters); *Baldwin* v. *Montana Fish & Game Comm'n,* 436 U. S. 371 (1978) (elk); *Douglas* v. *Seacoast Products, Inc.,* 431 U. S. 265 (1977) (menhaden); *Kleppe* v. *New Mexico,* 426 U. S. 529 (1976) (wild horses and burros).

from leaving the borders of the State and thus prevent the game from ever becoming the objects of interstate commerce. 161 U. S., at 530–532. Since the Court in *Geer* was of the view that the challenged statute effectively prevented certain game from entering the stream of interstate commerce, there could be no basis for a Commerce Clause challenge to the State's law. *Id.,* at 530, 532.[2] I do not dispute the Court's rejection of this theory; as the Court points out, this rationale was rejected long before today. *Ante,* at 329; see *West* v. *Kansas Natural Gas Co.,* 221 U. S. 229 (1911). My objection is that this line of reasoning, while undoubtedly considered important by the majority in *Geer,* is unnecessary to sustain that decision[3] and is unneeded in the disposition of the pres-

---

[2] "The fact that internal commerce may be distinct from interstate commerce, destroys the whole theory upon which the argument of the plaintiff in error proceeds. The power of the State to control the killing of and ownership in game being admitted, the commerce in game, which the state law permitted, was necessarily only internal commerce, since the restriction that it should not become the subject of external commerce went along with the grant and was a part of it." *Geer* v. *Connecticut,* 161 U. S., at 532.

[3] The Court in *Geer* assigned an alternative basis for its decision. The Court held that a State, in the exercise of its police power, could act to preserve for its people a valuable food supply, even though interstate commerce was remotely and indirectly affected.

"Aside from the authority of the State, derived from the common ownership of game and the trust for the benefit of its people which the State exercises in relation thereto, there is another view of the power of the State in regard to the property in game, which is equally conclusive. The right to preserve game flows from the undoubted existence in the State of a police power to that end, which may be none the less efficiently called into play, because by doing so interstate commerce may be remotely and indirectly affected. *Kidd* v. *Pearson,* 128 U. S. 1, *Hall* v. *De Cuir,* 95 U. S. 485; *Sherlock* v. *Alling,* 93 U. S. 99, 103; *Gibbons* v. *Ogden,* 9 Wheat. 1. Indeed, the source of the police power as to game birds (like those covered by the statute here called into question) flows from the duty of the State to preserve for its people a valuable food supply." *Id.,* at 534. See also *New York ex rel. Silz* v. *Hesterberg,* 211 U. S. 31, 41–42 (1908);

ent case. And no one—not the Oklahoma Court of Criminal Appeals or the State in this Court—contends that the minnows at issue are not the subjects of interstate commerce. It is obvious that the Court has simply set this theory up as a sort of strawman to facilitate the toppling of a decision which, in other respects, enunciates principles that have remained valid and vital, albeit somewhat refined, at least until today.[4]

The Court in *Geer* expressed the view derived from Roman law that the wild fish and game located within the territorial limits of a State are the common property of its citizens and that the State, as a kind of trustee, may exercise this common "ownership" for the benefit of its citizens. 161 U. S., at 529. Admittedly, a State does not "own" the wild creatures within its borders in any conventional sense of the word.[5] *Baldwin* v. *Montana Fish & Game Comm'n, supra,* at 386; *Douglas* v. *Seacoast Products, Inc.,* 431 U. S. 265, 284 (1977); *Toomer* v. *Witsell,* 334 U. S. 385, 401–402 (1948); *Missouri* v. *Holland,* 252 U. S. 416, 434 (1920). But the concept expressed by the "ownership" doctrine is not obsolete. *Baldwin* v. *Montana Fish & Game Comm'n, supra,* at 392 (BURGER, C. J., concurring). This Court long has recognized that the ownership

---

*Pennsylvania* v. *West Virginia,* 262 U. S. 553, 601 (1923) (Holmes, J., dissenting).

[4] Certain of the statements in the Court's opinion provide a basis for some hope that these principles may yet survive the overruling of *Geer.* See *ante,* at 337: "We consider the States' interests in conservation and protection of wild animals as legitimate local purposes"; *ante,* at 338: "The overruling of *Geer* does not leave the States powerless to protect and conserve wild animal life within their borders."

[5] The *Geer* Court itself did not use the term "ownership" in any proprietary sense. See 161 U. S., at 529: " 'We take it to be the correct doctrine in this country, that the ownership of wild animals, so far as they are capable of ownership, is in the State, not as a proprietor but in its sovereign capacity as the representative and for the benefit of all its people in common.' "

language of *Geer* and similar cases is simply a shorthand way of describing a State's substantial interest in preserving and regulating the exploitation of the fish and game and other natural resources within its boundaries for the benefit of its citizens. 436 U. S., at 386; *Douglas* v. *Seacoast Products, Inc., supra,* at 284; *Toomer* v. *Witsell, supra,* at 402.

In recognition of this important state interest, the Court has upheld a variety of regulations designed to conserve and maintain the natural resources of a State. See, *e. g., Baldwin* v. *Montana Fish & Game Comm'n, supra; Huron Portland Cement Co.* v. *Detroit,* 362 U. S. 440 (1960); *Lacoste* v. *Louisiana Dept. of Conservation,* 263 U. S. 545 (1924); *Patsone* v. *Pennsylvania,* 232 U. S. 138 (1914); *Geer* v. *Connecticut, supra; Manchester* v. *Massachusetts,* 139 U. S. 240 (1891); *McCready* v. *Virginia,* 94 U. S. 391 (1877); *Smith* v. *Maryland,* 18 How. 71 (1855). To be sure, a State's power to preserve and regulate wildlife within its borders is not absolute.[6] But the State is accorded wide latitude in fashioning regulations appropriate for protection of its wildlife. Unless the regulation directly conflicts with a federal statute or treaty, *Douglas* v. *Seacoast Products, Inc., supra,* at 283–285; *Kleppe* v. *New Mexico,* 426 U. S. 529, 546 (1976); *Missouri* v. *Holland, supra,* at 434; allocates access in a manner that violates the Fourteenth Amendment, *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410 (1948); or represents a naked attempt to discriminate against out-of-state enterprises in favor of in-state businesses unrelated to any purpose of conservation, *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S. 1, 13 (1928), the State's special interest in preserving its wild-

---

[6] *Geer* recognized limits to the exercise of the State's power to preserve wildlife within its boundaries. See *id.,* at 528 (this power, which the Colonies possessed, remains in the States "at the present day, in so far as its exercise may be not incompatible with, or restrained by, the rights conveyed to the Federal government by the Constitution").

life should prevail. And this is true no matter how "Balkanized" the resulting pattern of commercial activity.[7]

The Oklahoma law at issue in this case serves the special interest of the State, as representative of its citizens, in preserving and regulating exploitation of free-swimming minnows found within its waters. "[T]he law serve[s] to protect against the depletion of minnows in Oklahoma's natural streams through commercial exportation." 572 P. 2d 573, 575 (Okla. Crim. App. 1977). Oklahoma's statutory scheme may not be the most artfully designed to accomplish its pur-

---

[7] This view is fully consistent with the balancing approach to Commerce Clause decisionmaking enunciated in *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970), relied on so heavily by the Court. *Ante,* at 336. In *Pike,* the Court stated:

"Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." 397 U. S., at 142.

Given the primacy of the local interest here, in the absence of conflicting federal regulation I would require one challenging a state conservation law on Commerce Clause grounds to establish a far greater burden on interstate commerce than is shown in this case. See *infra,* at 344–345. See also *Hunt* v. *Washington Apple Advertising Comm'n*, 432 U. S. 333, 350 (1977): "[O]ur opinions have long recognized that, 'in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it' "; *H. P. Hood & Sons, Inc.* v. *Du Mond*, 336 U. S. 525, 567 (1949) (Frankfurter, J., dissenting): "Behind the distinction between 'substantial' and 'incidental' burdens upon interstate commerce is a recognition that, in the absence of federal regulation, it is sometimes—of course not always—of greater importance that local interests be protected than that interstate commerce be not touched."

pose.[8] But the range of regulations that a State may adopt under these circumstances is extremely broad, particularly where, as here, the burden on interstate commerce is, at most, minimal. See *Douglas* v. *Seacoast Products, Inc.,* 431 U. S., at 288 (REHNQUIST, J., concurring in part and dissenting in part); *Lacoste* v. *Louisiana Dept. of Conservation, supra,* at 552; cf. *Baldwin* v. *Montana Fish & Game Comm'n,* 436 U. S., at 391; *Kleppe* v. *New Mexico, supra,* at 545.

Contrary to the view of the Court, I do not think that Oklahoma's regulation of the commercial exploitation of natural minnows either discriminates against out-of-state enterprises in favor of local businesses or that it burdens the interstate commerce in minnows. At least, no such showing has been made on the record before us. Cf. *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132, 154 (1963). This is not a case where a State's regulation permits residents to export naturally seined minnows but prohibits nonresidents from so doing. No person is allowed to export natural minnows for sale outside of Oklahoma; the statute is evenhanded in its application. See Okla. Stat., Tit. 29, § 4–115 (B) (Supp. 1978). The State has not used its power to protect its own citizens from outside competition. See *Hunt* v. *Washington Apple Advertising Comm'n,* 432 U. S. 333 (1977); *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525 (1949). Nor is this a

---

[8] The Court seems to doubt the conservation purpose of the Oklahoma law because the State places no limit on the number of minnows a licensed dealer may take from state waters and imposes no regulation governing the disposition of minnows within the State. *Ante,* at 337–338, and n. 20. But the State could rationally have concluded that it could adequately preserve its natural minnow population without such additional measures. Tr. of Oral Arg. 18, 20, 21–23. Since, in my view, the prohibition on export of naturally seined minnows imposes little, if any, burden on the interstate commerce in minnows, the State has not violated the Commerce Clause by choosing an export ban on natural minnows as the means to effectuate its special interest in conserving wildlife located within its territorial limits.

case where a State requires a nonresident business, as a condition to exporting minnows, to move a significant portion of its operations to the State or to use certain state resources in pursuit of its business for the benefit of the local economy. See *Toomer* v. *Witsell,* 334 U. S. 385 (1948); *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S. 1 (1928); *Johnson* v. *Haydel,* 278 U. S. 16 (1928); cf. *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 145 (1970). And, notwithstanding the Court's protestations to the contrary, Oklahoma has not blocked the flow of interstate commerce in minnows at the State's borders. See *ante,* at 336–337. Appellant, or anyone else, may freely export as many minnows as he wishes, so long as the minnows so transported are hatchery minnows and not naturally seined minnows. On this record, I simply fail to see how interstate commerce in minnows, the commodity at issue here, is impeded in the least by Oklahoma's regulatory scheme.[9]

Oklahoma does regulate the manner in which both residents and nonresidents procure minnows to be sold outside the State. But there is no showing in this record that requiring appellant to purchase his minnows from hatcheries instead of from persons licensed to seine minnows from the State's waters in any way increases appellant's costs of doing business. There also is nothing in the record to indicate that naturally seined minnows are any more desirable as items of commerce than hatchery minnows. So far as the record before us indicates, hatchery minnows and naturally seined minnows are fungible. Accordingly, any minimal burden that may result from requiring appellant to purchase minnows destined for sale out of state from hatcheries instead of from

---

[9] Thus, even putting aside the decision in *Geer* and the principles for which it has come to be known and considering the Oklahoma statute "according to the same general rule applied to state regulations of other natural resources," *ante,* at 335, the Court still has failed to explain how Oklahoma's laws burden or discriminate against interstate commerce in minnows.

those licensed to seine minnows is, in my view, more than outweighed by Oklahoma's substantial interest in conserving and regulating exploitation of its natural minnow population. I therefore would affirm the judgment of the Oklahoma Court of Criminal Appeals.