The STATE of Oklahoma ex rel. The
POLLUTION CONTROL COORDI-
NATING BOARD, Appellee,

v.

KERR–McGEE CORPORATION, a corpo-
ration; Midland Cooperatives, Inc., a
corporation and Cushing Tank Car Com-
pany, Inc., a corporation, Appellants.

No. 50235.

Supreme Court of Oklahoma.

Nov. 4, 1980.

suit against Kerr–McGee Corporation (Kerr–McGee), Midland Cooperatives, Inc. (Midland) and Cushing Tank Car Company, Inc. (Cushing) to recover the sum necessary to restock the Cimarron River with fish.

The suit was based on the Pollution Control Coordinating Act 82 O.S.Supp.1968 § 931 et seq., since amended in 1971 and 1976, (the Act) and common law negligence. The petition alleged defendants did deposit deleterious substances into the Cimarron which caused the fish kill. In addition to actual damages in the amount of $50,211.45 necessary to restock the river, State asked for punitive damages of $250,000.00 on the grounds defendants acted with wanton and reckless disregard for the waterways and aquatic wildlife of this state.

At the initial hearing in 1973, the trial court sustained demurrers of all defendants. State appealed and this court reversed and remanded for trial in an opinion by Justice Hodges, *State ex rel. Pollution Control Co. v. Kerr–McGee Corporation, 532 P.2d 1386 (Okl.1975).*

Section 937(c) of the 1968 Act provides:

Any person, firm or corporation who violates any of the provisions of, or fails to perform any duty imposed by this Act or regulation issued hereunder, or who violates any order or determination of the board promulgated pursuant to this Act, and causes the death of fish or other wildlife shall, *in addition to the penalties provided* in subsection (b), be liable to pay to the State an amount equal to the sum of money reasonably necessary to restock such waters or replenish such wildlife as determined by the board. Such amount may be recovered by the board on behalf of the State in a civil action brought in the District Court. (Emphasis supplied).

This court in the original decision remanding for trial held this section to be constitutional and further held State's petition did state a cause of action under this section and in negligence. On remand defendants answered, alleging the death of the fish was not caused by any deleterious substances but by the depletion of oxygen caused by

Larry Derryberry, Atty. Gen., of Oklahoma, H. Lee Schmidt, Charles Helm, Asst. Attys. Gen. and Amalija J. Hodgins, Asst. Attys. Gen., of counsel; James R. Barnett and Barbara Rauch, Oklahoma City, for appellee.

B. J. Zimmerman, Oklahoma City, and Kerr, Davis, Irvine, Krasnow, Rhodes & Semtner by Francis S. Irvine, Oklahoma City, for appellant, Kerr–McGee Corp.

Fitzgerald, Houston & Worthington by Clee Fitzgerald, Stillwater, for appellant, Midland Cooperatives, Inc.

Barrow, Gaddis, Griffith & Grimm by William R. Grimm, Tulsa, for appellant, Cushing Tank Car Co., Inc.

DOOLIN, Justice:

In July of 1970, a sizeable number of fish died in the Cimarron River near Cushing, Oklahoma. Rangers visiting several sample points along the Cimarron estimated the number of fish killed at over 160,000. The State of Oklahoma ex rel. Pollution Control Coordinating Board (State) commenced this

the unusually high rainfall around that time.

The case was submitted to the jury who returned a verdict of $49,617.11 actual damages and $127,100.00 punitive damages. Defendants now appeal from the overruling of their motions for judgment notwithstanding the verdict and new trial.

I

Several allegations of error offered by one or more defendants must be initially considered as threshold issues concerning the standing of State to bring this action for both actual and punitive damages. Arguments in the decision in *State ex rel. Nesbitt v. Apco Oil Corporation, 569 P.2d 434 (Okl.1977)* dictates the state is not a "person" who could instigate such a suit, are without merit. That decision, distinguishable from the one at hand, was an antitrust case based on a statutory provision creating a cause of action for treble damages. Under special statute the state was not authorized to bring suit. Additionally, however, this court stated (at p. 436), "certainly the State of Oklahoma is a juristic person in the sense it has capacity to sue upon contracts or in vindication of its property rights."

■ The State has a statutory right of recovery when it must restock the waters with fish life due to a violation of the "Pollution Control Coordinating Act of 1968," 82 O.S.Supp.1968 § 937(c).

■ In addition there is a common–law right of the State that stems not from any proprietary interest in the fish but from "the legitimate state concerns for conservation and protection of wild animals ..." *Hughes v. Oklahoma, 441 U.S. 322, 99 S.Ct. 1727, 1738, 60 L.Ed.2d 250 (1979). Hughes* holds the states may promote the legitimate purpose of protection and conservation of wild animals within their borders so long as they remain consistent with the Commerce Clause of the United States Constitution and adhere to the basic principle that "our economic unit is the Nation".

In short, the state's common–law right to sue for wrongful destruction of wildlife is not dependent on ownership but rather on the sovereign power to regulate, preserve and protect wild animals and fish for the common enjoyment of its citizenry.[1]

■ Although the awarding of only nominal damages is a possibility, such award is nonetheless sufficient to lay a predicate for the additional recovery of punitive damages.[2]

■ Defendants next argue State could not file a civil action without first complying with provisions of the Act entitling a violator to notice of meeting of the Wildlife Commission, citing the initial decision of this court, *State ex rel. Pollution Control Board v. Kerr–McGee Corporation, supra.* Defendants are referring to a meeting of the Wildlife Commission where it determined the amount of damages that would be sought in the present suit based on the cost to restock the Cimarron.

Section 936 of the Pollution Control Coordinating Act and Section 301 et seq. of the Administrative Procedures Act, 75 O.S. Supp.1969, require notice of hearing before the Board of Department of Pollution Control (Board) may issue any order. However, Section 301(2)(C) of the Administrative Procedures Act exempts from the Act "statements concerning only the internal management of an agency and not affecting private rights or procedures available to the public." The meeting concerned here was not a meeting of the Pollution Control Board but rather a meeting of the Wildlife Conservation Commission to determine restocking costs. No order issued from the meeting. No penalty was assessed under the penal portion of the statute. Defendants received actual notice of the amount of damages sought. They had ample opportunity to rebut the evidence of damages at trial. Defendants show no prejudice by any lack of notice of this meeting. Although

1. *Herrin v. Sutherland*, 74 Mont. 587, 241 P. 328, 42 A.L.R. 937 (1925).

2. *Moyer v. Cordell*, 204 Okl. 255, 228 P.2d 645, 650 (1951).

our previous decision stated the issue of actual notice was for trier of fact,[3] this would only apply if notice was an issue. Trial Court correctly held such was not the case.

■ Defendants also urge State could not seek punitive damages in addition to actual damages under the Act because this would be a double penalty prohibited by 21 O.S. 1971 § 11. This might be a valid argument if State had imposed a penalty as provided by Section 937(b) of the 1968 Act.[4] The record, however, does not reflect any action taken under this provision. Rather State filed the present suit seeking civil damages based on the Act and on common law negligence. This action is neither criminal nor penal in nature but compensatory. There is no double jeopardy in civil enforcement.[5] Punitive damages are inherently cumulative and may be recovered if the jury finds they are warranted. State has standing and properly brought this action.

## II

■ Defendants submit several evidentiary rulings as errors in the proceeding. State introduced its Water Quality Standards, to evidence violations on the part of all defendants creating a cause of action under the Act. Defendants submit their adoption was not in compliance with the State Agency Rules and Regulations, more specifically 75 O.S.Supp.1961 §§ 251–257 in that while the Water Quality Standards were properly filed with the Secretary of State, they were not published in the Oklahoma Gazette in their entirety. The terms of Section 255 provide regulations made by a state agency shall be void unless filed and published in the Oklahoma Gazette. Volume 8, § 2, of the Gazette at page 279 in reference to these standards states: "Due to the length of manual filed, it is not being published at this time, however, a copy of it is on file at this office for public inspection." It is apparent Board properly filed the standards with the Secretary of State. While not actually reproduced in the Gazette, the standards were "published" in the sense of being made public.[6] The purpose of the section 255 publication requirement is to give public notice of the law contained therein. In the instant case the standards were properly adopted and filed. The terms of section 936(d) of the 1968 Pollution Control Coordinating Act provide that procedures of the Board shall be conducted in compliance with the Administrative Procedures Act [APA]. 75 O.S.Supp.1969 § 301 et seq.[7] Assuming without deciding that section 255 publication standards apply to APA–governed agencies, that section was doubtless satisfied here by publication of notice in the Gazette and the pre–announced availability of the water quality standards for public inspection.[8]

3. 532 P.2d 1386, 1388:
    "We believe the statute in question conforms with the standards of due process. Notice and the opportunity for hearing is provided by terms of the statute. Whether the statute was followed and actual notice given is a question of fact to be determined by the trier of the facts."

4. § 937: Penalties–Injunction–(b) Any person, firm or corporation who violates any provision of this Act by knowingly or wilfully disposing of or discharging either directly or indirectly any untreated or inadequately treated wastes which pollute the waters of the State in violation of this Act or regulations or standards of water quality established under the provisions of the Act or who knowingly or wilfully violates any other pollution control statute of this State or regulations relating thereto established pursuant to law shall be guilty of misdemeanor and upon conviction shall be punished by a fine of not more than Five Hundred Dollars ($500.00), or by imprisonment for a term of not more than ninety (90) days or by both such fine and imprisonment. Each and every day the violation occurs shall constitute a separate violation.

5. See *Helvering v. Mitchell*, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938).

6. Black's Law Dictionary, 1385 (4th Ed.Rev. 1968).

7. The Administrative Procedures Act in § 304(a) makes reference to the requirements of § 251 of the State Agency Rules and Regulations.

8. The APA, first adopted in 1963, provides in section 304(b)(1) that each rule adopted is effective twenty days after filing except that "if a

Evidence at trial showed Skull Creek, a tributary of the Cimarron, rises in the area of Midland's refinery and passes through Kerr–McGee and Cushing's plants. Evidence further demonstrated wastes from defendants' plants were discharged into this creek. On the night of July 15, 1970, a heavy rain caused Skull Creek to overflow into the Cimarron. Witnesses observed separating tanks and oil traps belonging to Midland and Kerr–McGee and a residue pond owned by Cushing had overrun. There was testimony that as much as 50 barrels of oil may have flown into the creek from Kerr–McGee alone. The oil left a deposit above the waterline on the banks of Skull Creek. The plume of oil could be observed entering the Cimarron for three or four hundred yards before it dispersed. Above the entrance of Skull Creek into the Cimarron no pollution was observed. Evidence also indicated over 3,000 pounds of ammonia escaped from Cushing's plant in the same manner.

Plaintiff's Exhibit 20 consists of reports of chemical analysis of water samples taken from *Skull Creek* from July 1970 to May 1971, performed by the Water Resources Division of the United States Geological Survey. The exhibit was introduced through a chemist employed in that division. These analyses for various state agencies are performed in accordance with certain standards of the United States Geological Service. Defendants objected to their admission because the chemist did not herself perform the tests.

■ In *Town of Sentinel v. Riley, 171 Okl. 533, 43 P.2d 742 (1935)* this court held reports of water analysis kept in the office of the State Board of Health were admissible under the rule allowing admission of official records. We hold the reports of

water analysis kept by representative of the United States Geological Survey for that purpose and shown to be made in accordance with reliable standards constituted official records under 12 O.S. 1971 § 486. These reports were not certified in compliance with section 486 admission requirements. Assuming that want of certification did constitute a vice operating to render the reports inadmissible,[9] other evidence was introduced to support the presence of ammonia as well as a variety of toxic substances in the affected water courses. Although the admission of the uncertified report must be deemed improper, we cannot view its content as inflammatory in the circumstances of this case. This is so because the very same information came to the jury's attention from many other evidentiary sources with unassailed admissibility credentials.

■ Additional evidentiary errors submitted include admission into evidence of certain exhibits, notably photographs and motion pictures of the dead fish and water analysis of *Deer Creek*[10] taken subsequent to the discovery of the fishkill. Appellants argue because they did not deny fish were killed, the pictures only served to confuse and inflame the jury. Also they argue the water analyzed was from Deer Creek, not the Cimarron, and was taken *after* the fish were killed; thus it was not material. The photographs illustrated the fact of the fishkill and were material to support the suit. The water sample evidenced the content of the Cimarron. Testimony showed rain had washed water from the Cimarron into Deer Creek. It was not reversible error for the trial court to admit the photographs and the water analysis.

later date is required by statute or specified in the rule, the later date is the effective date." The APA's section 304(b)(1) makes no specific mention of publication requirement in the Gazette. It does not expressly make publication a prerequisite to the validity of rules. We do not have to deal directly with that issue to decide the instant case. We hence simply assume, without deciding, that if the publication requirement of section 255 does apply to APA–

governed agencies, the provisions of that section were amply satisfied even though the water quality standards were not published *in toto.*

9. *State ex rel. Blankenship v. Freeman,* 440 P.2d, 744, 758–759 (Okl.1968).

10. Deer Creek is an intermittent stream flowing into the Cimarron.

■ Defendant Cushing objected to the admission of testimony of a qualified expert reference his opinion as to the cause of the fish dying. He testified that part of the basis of his opinion was information relayed to him by a ranger. Cushing claimed this is impermissible hearsay. Not so. The hearsay rule applies to out of court statements offered to prove the truth of the matter asserted therein. The objection is not well founded for the information the game ranger supplied did not destroy the full probative value of the expert's testimony. In our opinion it was not the sole source of information considered by the expert as a basis of his opinion. For another analysis see *Jones on Evidence, § 14.21 et seq. (6th Ed.1972).*

State offered an abundance of other testimony in addition to the above evidence supporting the jury's finding the fishkill resulted from an overflow of deleterious materials from Skull Creek. The reason for the death of the fish was not speculative. Experts examining the fish found them to be hemorrhaging around the gills, indicative of ammonia poisoning. Some fish were also covered with oily slime. The experts determined the fish died from a toxic condition associated with oil, ammonia and phenolic compounds. These substances emanated from defendants' business operations on Skull Creek.

■ Although there was no testimony as to the exact percentage of toxic substances in the water, toxic substances were present in such quantities that the fish died. This is sufficient to indicate a violation of the Oklahoma Water Quality Standards No. 10.[11]

The burden is on defendants to show insufficient evidence was offered to support the jury's verdict. Where there is any competent evidence reasonably tending to support the verdict of the jury, this court will not disturb its verdict and the judgment based thereon.[12]

■ There was competent evidence defendants violated the Water Quality Standards and also were guilty of common law negligence in allowing deleterious substances to escape into Skull Creek and ultimately into the Cimarron. Analysis of the fish and water samples led experts to conclude oil and ammonia were the cause of the death of the fish. From an examination of the evidence it would be extremely difficult for a jury to have found the fish died of natural causes as claimed by defendants. See *Stanolind Oil & Gas Co. v. Cartwright, 200 Okl. 633, 198 P.2d 737 (1948).*

■ Defendants further argue trial court erroneously instructed the jury on the measure of damages, submitting it should have been the market value of the fish rather than the cost of restocking the Cimarron. 82 O.S.Supp.1968 § 937(c) makes the measure of damages, the cost of restocking. Experts testified this would be $49,617.11, the amount prayed for in State's petition as determined by the Wildlife Commission. This of necessity includes *all* costs of restocking, such as price of fish, capture and transportation and labor. The jury was instructed actual damages could not exceed this amount.[13] We hold jury's finding of liability and assessment of actual damages was supported by sufficient competent evidence.

11. Oklahoma Water Quality Standards for the Cimarron River as approved and published by Oklahoma Water Resources Board (1968) # 10 provides:
    "Toxic Substances–Toxic substances shall not be present in such quantities as to cause the waters to be toxic to human, animal, plant, or aquatic life. For aquatic life, using bioassay techniques, the toxic limit shall not exceed one–tenth of the 48–hour median tolerance limit, except that other limiting concentrations may be used in specific cases

    when justified on the basis of available evidence and approved by the regulatory authority.

12. *Hames v. Anderson*, 571 P.2d 831 (Okl. 1977); *Cuberly Bros. Mercantile Company v. Boggess*, 147 Okl. 39, 294 P. 186 (1930).

13. Defendants objected to this instruction fixing measure of damages but record does not reflect any substitute instruction requested by defendants.

## III

Defendants claim the trial court erred in submitting the issue of punitive damages to the jury. Instruction No. 9 provided:

"You are to consider this instruction only if you award the plaintiff actual damages.

You are instructed that the plaintiff in addition to actual damages is claiming punitive or exemplary damages. You are instructed that wilful actions in reckless disregard of another's rights may give rise to exemplary or punitive damages. *The Court is of the opinion that the plaintiff has failed to prove that the defendants acted wilfully or maliciously, or with wilful or reckless disregard for the rights of the plaintiff.*

However, if you find from the evidence that the defendants or any one of them acted wilfully or maliciously, or with wilful or reckless disregard of the rights of the plaintiff, then you may consider exemplary or punitive damages and award the plaintiff such sum as you think just and proper in the exercise of your sound discretion and judgment, but in no event can such sum exceed $250,000.00, the amount sued for." (Emphasis supplied).

The jury awarded $127,100.00 punitive damages.

Defendants claim this instruction reflects there was no evidence on which to base punitive damages, indicated by the comment of the trial court that plaintiff "failed to prove that the defendants acted wilfully or maliciously, or with wilful or reckless disregard for rights of the plaintiff."

Before this court will reverse a case for alleged error in giving instructions, it must clearly appear that the instruction complained of has caused a miscarriage of justice.[14] Although the trial court no doubt erred in commenting on the evidence,[15] such comment would not be error *against* the defendants but could act in their favor. In this case no miscarriage of justice could be demonstrated by the court's comment.

23 O.S. 1971 § 9 provides a jury may award punitive damages where defendant has been guilty of oppression or malice, actual or presumed. Malice is legally presumed if defendants' conduct evidences gross negligence or reckless disregard for plaintiff's property.[16]

In *Pennsylvania Glass Sand Corporation of Oklahoma v. Ozment, 434 P.2d 893 (Okl. 1967),* an operator of a factory dumped waste oil over the surface of the land into a pond where cattle watered belonging to plaintiff and into grassland where the cattle grazed. This court upheld the jury's verdict for actual and *punitive* damages based on common law negligence. In its syllabus this court pointed out exemplary damages are imposed by the law on the theory of punishment to the offender, for the general benefit of society and are allowed in cases where gross negligence or malice, actual or presumed, enter into the case. "A person may commit such wilful acts in reckless disregard of another's rights that gross negligence may be inferred."[17]

There was testimony Skull Creek was knowingly being used for waste disposal by defendants. Evidence showed defendants had notice of pollution of the creek weeks before the fish were killed and had been told to correct the situation. Defendants failed to take any corrective action. Tanks continued to be drained directly into Skull Creek without addition of a neutralizer. Oil traps belonging to Kerr–McGee and Midland were known to overflow during high rainfall. There was testimony Cushing also maintained its waste ponds at dangerously high levels knowing they overflowed during high rains.

■ Whether defendants' conduct was sufficiently reckless to merit punishment by an award of punitive damages is a jury

14. *Sunray DX Oil Co. v. Brown,* 477 P.2d 67 (Okl.1970).

15. See *Wickham v. Belveal,* 368 P.2d 315 (Okl. 1963).

16. *Sunray DX Oil Company v. Brown,* supra, n. 12; *Morgan v. Bates,* 390 P.2d 486 (Okl.1964).

17. Also see *Garland Coal Company v. Few,* 267 F.2d 785 (10th Cir. 1959).

question.[18]  It is impossible to say from a reading of the record there was no evidence reasonably tending to support an inference of gross negligence.  Under such circumstances, it was not only proper for the trial court to submit that question to the jury, but it was his duty to do so.[19]  Only when there is no evidence whatsoever that would give rise to an inference of malice or conduct deemed equivalent to malice may the trial court refuse to submit an exemplary damage instruction to the jury.[20]

We hold the essential elements necessary to establish the State's cause of action for both actual and punitive damages are supported by the evidence elicited at trial. This removed the case from the realm of conjecture and placed it within the sphere of legitimate and rational inferences.[21]  We find no error on which to reverse the jury's verdict.

AFFIRMED.

LAVENDER, C. J., IRWIN, V. C. J., and WILLIAMS, HODGES, BARNES, HARGRAVE and OPALA, JJ., concur.

---

18. See *Sopkin v. Premier Pontiac, Inc.*, 539 P.2d 1393 (Okl.App.1975).

19. *Reed v. Fichencord*, 96 Okl. 3, 219 P. 937 (1923).

20. *Sopkin v. Premier Pontiac, Inc.*, supra, n. 16.

21. *Pennsylvania Glass Sand Corporation of Oklahoma v. Ozment*, 434 P.2d 893 (Okl.1967).