Paul C. Wilson, Judge
The Missouri Conservation Commission ("Commission"), its individual members,[1] and the Missouri Department of Conservation ("Appellants") appeal the judgment of *465 the circuit court in this declaratory and injunctive relief action brought by Donald Hill and Oak Creek Whitetail Ranch, LLC, Travis Broadway and Winter Quarters Wildlife Ranch, LLC, and Kevin Grace and Whitetail Sales and Service LLC ("Respondents"). This Court has jurisdiction under article V, section 10 of the Missouri Constitution, and the judgment is reversed.
Background
This case concerns the regulatory authority of the Commission, which was created by an amendment to the Missouri Constitution first approved by the voters in 1936. Under this amendment, the Commission has authority over the "control, management, restoration, conservation and regulation of the bird, fish, game, forestry and all wildlife resources of the state." Mo. Const. art. IV, § 40(a). Today, the Commission acts through the Missouri Department of Conservation, see § 252.002, RSMo 2000, and regulates a variety of animal species, including elk and deer. These species are members of the family cervidae and are commonly known as cervids.
Respondents participate in the captive cervid industry, which generally engages in two types of commercial activities: the selective breeding of cervids for large antlers and other desirable genetic traits, and the operation of private hunting preserves at which hunters pay to hunt and take trophy bucks. Respondents rely on an interstate market in captive cervids to obtain the animals they need for their breeding operations and to meet demands for hunting on their preserves.
Respondent Hill is the co-owner of Oak Creek Whitetail Ranch, a large hunting preserve and white-tailed deer breeding operation. Evidence in the record shows he has about 300 deer in his hunting preserve and about 500 deer in his breeding facility. Respondent Broadway is the owner of Winter Quarters Wildlife Ranch, a large hunting preserve and luxury lodge. He offers three-day guided hunts of a variety of animals, including elk. Respondent Broadway also maintains an elk and red deer breeding operation to stock his hunting preserve. Respondent Grace is the owner of Whitetail Sales and Service LLC, a breeding facility for white-tailed deer, sika, and red deer. He also brokers deals between breeders and hunting preserves and presides over periodic captive cervid auctions. Respondents cannot operate their hunting preserves and breeding facilities without permits from the Department of Conservation. See § 252.040, RSMo 2000; 3 CSR §§ 10-9.350, 10-9.351, 10-9.560. Respondents Hill and Broadway have separate permits for their breeding and hunting activities, and Respondent Grace has a breeder's permit.
Cervids, like those owned by Respondents, can be infected with a fatal neurodegenerative disease known as chronic wasting disease ("CWD"). CWD can be spread directly through animal-to-animal contact or indirectly through environmental contamination. Symptoms of CWD include emaciation, bizarre behavior, and problems with movement. Over time, the disease seriously damages the brain of an infected cervid and eventually results in death. The disease has an incubation period of roughly 18 months, however, meaning a cervid can carry CWD-and possibly infect other cervids with it-long before it shows any symptoms. There is currently no known cure for the disease, and there is no approved method for testing cervids for CWD while they are still alive. The only approved test must be performed postmortem.
CWD was first discovered in 1967. Since then, it has been detected in 24 states, two *466 Canadian provinces, South Korea, and Norway. CWD was first detected in Missouri in 2010 at Heartland Wildlife Ranches (which was eventually purchased by Respondent Broadway and renamed Winter Quarters Wildlife Ranch). In response, the Commission created a surveillance zone within 25 miles of that facility. From 2010 to 2013, the Commission tested more than 14,000 deer within this zone and found 10 free-ranging deer infected with CWD. The Commission later tested 356 deer at a second Heartland facility (also owned now by Respondent Broadway) and found 10 captive deer infected with CWD.[2] Over the next three years, the Commission detected CWD in 14 free-ranging deer, several of which were found near closed or currently operating captive cervid facilities.
In an attempt to eradicate CWD, the Commission proposed a series of regulatory amendments that were to take effect in January 2015. Those amendments were directed at the captive cervid industry, which already was regulated by the Commission. As amended, the regulations most pertinent to this case (a) banned the importation of cervids, see 3 CSR §§ 10-9.353(2), (9), 10-9.565(1)(B)(9) ; (b) imposed more rigorous fencing requirements, see 3 CSR § 10-9.220(3) ; and (c) imposed more rigorous recordkeeping and veterinary inspection requirements, see 3 CSR § 10-9.353(3).
Respondents sued Appellants to prevent these amended regulations from going into effect. After issuing a preliminary injunction, the circuit court held a trial. Following the trial, the circuit court declared the challenged regulations were invalid and enjoined the Commission from enforcing them. The circuit court entered judgment for Respondents on Count I of the petition, concluding the amended regulations were invalid and could not be enforced against Respondents because their cervids are not "game" or "wildlife resources of the state" that are subject to regulation by the Commission under article IV, section 40(a), of the Missouri Constitution.[3] The circuit court also entered judgment for certain Respondents[4] on Count II of the petition, concluding the amended regulations were invalid and could not be enforced because they infringed upon Respondents' right to farm under article I, section 35 of the Missouri Constitution.
Analysis
In an appeal from a court-tried civil case, "the trial court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law."
*467 White v. Dir. of Revenue , 321 S.W.3d 298, 307-08 (Mo. banc 2010) (citing Murphy v. Carron , 536 S.W.2d 30, 32 (Mo. banc 1976) ). The circuit court's determinations of questions of law are subject to de novo review. See Pearson v. Koster , 367 S.W.3d 36, 43-44 (Mo. banc 2012).
Appellants raise three points. First, they claim the circuit court erred because Respondents' cervids are "game" and "wildlife resources of the state" and, therefore, can be regulated by the Commission under article IV, section 40(a) of the Missouri Constitution. Second, Appellants claim the circuit court erred because the Commission's exercise of its constitutional authority to promulgate the regulations at issue in this case does not implicate or infringe upon Respondents' right to farm under article I, section 35 of the Missouri Constitution. Finally, Appellants claim the circuit court erred by enjoining the Commission's enforcement of the new regulations against any person in Missouri, rather than merely against Respondents. Because this Court reverses and enters judgment for Appellants on the first two claims, it does not reach or decide this third claim.
IA.
The Commission's power to regulate Respondents' cervids derives from article IV, section 40(a), of the Missouri Constitution. In pertinent part, this provision authorizes the Commission to regulate "the bird, fish, game, forestry and all wildlife resources of the state." Mo. Const. art. IV, § 40(a). In interpreting this language, the Court must ensure the words of this provision bear the meaning they were understood to have in their proper context when Missouri voters adopted this provision. See Farmer v. Kinder , 89 S.W.3d 447, 452 (Mo. banc 2002).
Respondents' claim is captive cervids are not "wildlife" or "game" and, therefore, the Commission has no authority under article IV, section 40(a), to promulgate regulations concerning them. Respondents contend the term "wildlife" refers to individual animals that are both: (a) wild by nature; and (b) never tamed or domesticated. Even though captive cervids are members of species that are wild by nature, Respondents argue they cannot be "wildlife" because they are domesticated and, therefore, akin to livestock. Respondents also appear to argue "game" is a subset of "wildlife," i.e., that "game" is merely "wildlife" pursued for sport, food, or other lawful purposes. Because captive cervids are too domesticated to qualify as "wildlife," Respondents contend those individual animals cannot-by definition-qualify as "game."
The Court rejects these readings. The terms "game" and "wildlife" are plain and unambiguous as used in article IV, section 40(a), which is concerned with the preservation and conservation of the state's forestry and wildlife resources. In this context, the term "wildlife" plainly includes all species that are wild by nature. See, e.g., Wild Animal , Black's Law Dictionary (10th ed. 2014) (the term "wild animal"-or animal ferae nature -refers to "[a]n animal that is not customarily devoted to the service of humankind in the place where it normally lives," especially "a type of animal that ... is naturally untamable, unpredictable, dangerous, or mischievous").[5]
*468 Similarly, the term "game" plainly includes all species that are wild by nature and that are often pursued for sport, food, or other lawful ends. See Webster's Third New International Dictionary 933 (1966) ("game" are "animals considered worthy of pursuit by sportsmen; esp : wild animals hunted for sport or food"). Applying these plain meanings, Respondents' cervids-whether tame or wild-are "game" and "wildlife" within the meaning of article IV, section 40(a).
Respondents argue the terms "game" and "wildlife" are ambiguous. When viewed in light of history, grammar, and other contextual clues, Respondents argue these terms connote individual animals within a species rather than a wild species as a whole. This Court disagrees. Even if the Court were to find the terms "game" and "wildlife" ambiguous, it would simply make it appropriate for the Court to consult the canons of construction. Ivie v. Smith , 439 S.W.3d 189, 202 (Mo. banc 2014). Those canons cannot be used to change the plain meaning of the terms "game" and "wildlife." In this case, they confirm the plain meaning.
As an initial matter, Respondents' readings are unreasonable because they would have the Commission's authority be determined not on a rational species-by-species basis but on an unworkable animal-by-animal basis. See Bassen v. Monckton , 308 Mo. 641, 274 S.W. 404, 407 (Mo. 1925) ("The courts will not give a [law a] construction which would render it ... unreasonable, when it is susceptible of a ... reasonable one."). Respondents apparently concede the Commission has constitutional authority to regulate individual cervids that are born free and still free-roaming, but Respondents' definition of "wildlife" and "game" would have that authority evaporate whenever those individual cervids qualify as domesticated. Respondents fail to explain how many months (or years or generations) it takes for an individual cervid to qualify as domesticated under their definition. Nor do Respondents explain whether this change is irreversible and the same for every individual cervid or, worse, whether the Commission must continually reassess its authority to determine which individual members of cervid species it may regulate and which it may not. Finally, and most importantly, Respondents fail to identify any text in article IV, section 40(a), suggesting the broad authority granted to the Commission must be determined one animal at a time.
Furthermore, though historical context can help give meaning to an ambiguous word or phrase, State ex rel. O'Connor v. Riedel , 329 Mo. 616, 46 S.W.2d 131, 133-34 (Mo. banc 1932), it cannot change the meaning of the broad words used here. The history and context of article IV, section 40(a), strongly support the plain meaning of "wildlife" and "game." Captive or domesticated cervid operations similar to those owned by Respondents existed in this state long before article IV, section 40(a), was adopted.[6]
*469 Those operations were regulated under statutes that used terms making cervids "wildlife" and "game" even if they were domesticated or raised in captivity.[7]
This Court similarly interpreted the term "game" (and, therefore, "wildlife") in State v. Weber , 205 Mo. 36, 102 S.W. 955 (Mo. 1907), decided prior to the adoption of article IV, section 40(a). In Weber , the Court reasoned that deer "fawned and raised in captivity" were "game," even though the enclosure in which the deer "were kept was never maintained as a game preserve," and even though the deer were never "raised or used for hunting purposes." Id. at 955. This Court reasoned the term "game" was "broad and comprehensive enough to embrace ... all kinds of deer, whether tame or wild," free "or reduced to captivity." Id. at 956. The Court emphasized "the deer in question come within the meaning of the term 'game,' which means animals feræ naturæ , or wild by nature. It makes no difference that said deer were raised in captivity, and had become tame. They are naturally wild." Id. at 957.
Accordingly, before article IV, section 40(a), was adopted, both this Court and prior statutes used the term "game" to include any animal belonging to a species both wild by nature and generally pursued for food, sport, or other lawful ends. More to the point, both this Court and prior statutes expressly included cervids-captive and otherwise-within the terms "game" and "wildlife." This Court must presume the voters were aware of and accounted for this common use when they adopted article IV, section 40(a). State, on Inf. of McKittrick v. Cameron , 342 Mo. 830, 117 S.W.2d 1078, 1082 (Mo. banc 1938).
The Court's decision in this case also is consistent with the regulations first adopted by the Commission in implementing article IV, section 40(a). After the voters adopted this provision, the Commission began to regulate captive cervid operations and, in 1941, the Commission adopted a code of regulations explaining that deer and elk-whether free or confined, wild or domesticated-are "game" and "wildlife." The code's definition of "game" is clearly concerned with animal species. See Wildlife and Forestry Code of the State of Missouri, p. 45 (1941) (the term "game" includes *470 "all the species listed herein as game birds, game animals, game fish, minnows, and frogs"). Notably, the code lists deer as one of the very first examples of "game," id. (the term "game animals" includes "deer"), and it is apparent elk are also "game," id. at § 84, p. 36 (governing storage of "[d]eer, elk, moose, ... or other big game animals"). The code makes no exceptions for deer or elk held or substantially domesticated in captivity, even though a large part of the code governs captive cervid operations, and even though it was known that these operations could contain domesticated cervids. The code also repeatedly assumes "game," including deer and elk raised and domesticated in captivity, are "wildlife" and, again, it makes no exception for deer or elk held or substantially domesticated in captivity. See, e.g. , id. at § 38(b), pp. 13-14 (1941) (discussing "a private game farm" and "such wildlife ... therefrom"); id. at § 83, pp. 35-36 (discussing "[g]ame ... propagated and held in captivity" and the liberation of this "[w]ildlife"); id. at p. 45 (the term "game" means "all the species listed herein," but certain species may be removed "in the interest ... of wildlife resources"). A few years later, the legislature repealed existing fish and game laws and enacted the "Wildlife and Forestry Law" defining "wildlife" as "all wild birds, mammals, fish and other aquatic and amphibious forms, and all other wild animals, regardless of classification, whether resident, migratory or imported, protected or unprotected, dead or alive; and shall extend to and include any and every part of any individual species of wildlife." § 252.020(3), RSMo 2000.[8]
Therefore, even if this Court were to agree the terms "wildlife" and "game" are ambiguous, the regulations interpreting them and the statutes addressing similar subjects shortly after the adoption of article IV, section 40(a), are consistent with this Court's holding that the term refers to species, not individual animals. See 1 J. Story, Commentaries on the Constitution of the United States § 408, p. 301 (4th ed. 1873) ("[T]he most unexceptionable source of collateral interpretation is from the practical exposition of the government itself in its various departments...."). As is the fact that the Commission has regulated captive cervid enterprises for a significant period of time. See State ex inf. McKittrick ex rel. Ham v. Kirby , 349 Mo. 988, 163 S.W.2d 990, 996 (Mo. banc 1942) (though usage cannot change a term's plain and unambiguous meaning, long-established usage by the legislative and executive branches is probative when construing an ambiguous term).
In sum, the Court holds the terms "game" and "wildlife" as used in article IV, section 40(a) are unambiguous: "wildlife" means species that are wild by nature, and "game" means wildlife species that are often pursued for sport, food, or other lawful ends. Even if the terms "wildlife" and "game" were ambiguous, canons of construction merely confirm these meanings.[9] Accordingly, the Court holds the *471 Commission has authority under article IV, section 40(a), to regulate Respondents' captive cervids as "wildlife" and "game."
II.
Even if Respondents' captive cervids are "wildlife" and "game," Respondents claim the Commission may not regulate them under article IV, section 40(a), because they are owned by Respondents and, therefore, are not "resources of the state." Mo. Const. art. IV, § 40(a). The Court rejects this interpretation of the quoted phrase.
As noted above, the Commission's regulations under article IV, section 40(a), have always regulated captive deer and elk owned by private parties. This long-settled construction weighs against the interpretation for the phrase "resources of the state" urged by Respondents. Kirby , 163 S.W.2d at 996.
Respondents' interpretation rests on an outdated legal fiction. Under that reading, game and wildlife are "resources of the state" only when they are in the wild because "wild" animals are said to be "owned" by the state. The notion that the state "owns" animals in the wild does find some support in the language of older cases, see, e.g., State v. Heger , 194 Mo. 707, 93 S.W. 252, 253 (Mo. 1906), but this notion is not to be taken literally:
[I]t is pure fantasy to talk of [the State] "owning" wild fish, birds, or animals. Neither the States nor the Federal Government, any more than a hopeful fisherman or hunter, has title to these creatures until they are reduced to possession by skillful capture.... The "ownership" language of [older] cases ... must be understood as no more than a 19th-century legal fiction expressing "the importance to [the] people that a State have power to preserve and regulate the exploitation of an important resource."
Hughes v. Oklahoma , 441 U.S. 322, 334-35, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (citations omitted).[10] Respondents have failed to show Missouri voters' understanding *472 of article IV, section 40(a), was based upon this legal fiction when they first approved this provision.
Rather than adopt Respondents' strained interpretation of the phrase "resources of the state," the Court holds this phrase plainly and unambiguously refers to resources inside the territory or geographical boundaries of this state. When people speak of "the mountains of Wyoming," "the lakes of Minnesota," or "the forests of Michigan," they do not mean only the mountains, lakes or forests owned by those state governments. By the same token, when Missouri voters approved constitutional provisions creating the Commission and authorizing it to regulate the "game" and "wildlife resources of the state," they did not understand that authority to be restricted only to such resources owned by the state. Instead, they understood the authority they were giving to the Commission would extend to resources throughout this state.
Again, even if the phrase were ambiguous, making it appropriate to consult historical context, the Court's conclusion would not change. At the time article IV, section 40(a), was adopted, implementing regulations (and even prior statutes) extended the regulatory power of the state to all wildlife and game within its borders, regardless of ownership. See Marsh v. Bartlett , 343 Mo. 526, 121 S.W.2d 737, 744 (Mo. banc 1938) ("[A] state, in the exercise of its police power, [may] regulate and control game and fish within the state...."); see also Cameron v. Territory , 16 Okla. 634, 86 P. 68, 70 (Okla. 1906) ("[T]he power of the Legislature [to absolutely prohibit the taking or sale of game] only applies to game within the state."). Shortly after the adoption of article IV, section 40(a), the legislature enacted a statute providing that no one could obtain "any title, ownership or possessory right" in any "wildlife of and within the state" unless he or she lawfully seizes that wildlife. § 252.030, RSMo 2000 (emphasis added).[11] Finally, this Court has refused to infer restrictive ownership limitations into statutes otherwise employing broad, plain terms.[12]
Accordingly, this Court holds Respondents' captive cervids are subject to regulation by the Commission under article IV, section 40(a), as "game ... and wildlife resources of the state" because (a) those cervids are members of species that are wild by nature and, therefore, are "wildlife;" (b) they are members of wildlife species generally pursued for food, sport, or other lawful ends and, therefore, are "game;" and (c) even though privately owned, they are physically located within the borders of this state and, therefore, *473 are "resources of the state." Appellants' Point I is granted.
II.
In their second point, Appellants contend the circuit court erred in concluding the January 2015 regulations were invalid and could not be enforced because those regulations impermissibly infringed on Respondents' right to farm under article I, section 35 of the Missouri Constitution. The Court agrees.
Respondents' challenge to the validity of the amended regulations is subject to de novo review. Hill v. Boyer , 480 S.W.3d 311, 313 (Mo. banc 2016). The regulations are presumed to be constitutional, and the regulations can be found unconstitutional only if Respondents prove the regulations "clearly and undoubtedly" violate article I, section 35. State v. Vaughn , 366 S.W.3d 513, 517 (Mo. banc 2012).
The claim that article I, section 35, protects Respondents from regulations promulgated under the authority granted to the Commission under article IV, section 40(a), fails at the threshold. Article I, section 35, added to our constitution in 2014 by Missouri voters, guarantees "the right of farmers and ranchers to engage in farming and ranching practices." Respondents failed to show they are "engage[d] in farming and ranching practices" and, therefore, cannot invoke this guarantee.
The precise contours of "farming and ranching practices" protected by article I, section 35, are difficult to identify, as is the nature of the protection afforded by that provision. But neither question needs to be answered in this case. Instead, it is sufficient to resolve this case to hold only that nothing in the language of article I, section 35, suggests it was intended to limit the Commission's constitutional authority under article IV, section 40(a), to regulate Respondents' captive cervids as "wildlife" and "game" resources of this state.[13]
The Court's decision in State v. Shanklin , 534 S.W.3d 240 (Mo. banc 2017), is instructive, if not controlling. There, the issue was whether the defendant's cultivation of marijuana was a "farming practice" protected by article I, section 35, even though marijuana cultivation had been prohibited in this state long before the constitutional "right to farm" provision was adopted. This Court held nothing in the text of article I, section 35, supported the idea that Missouri voters intended to create a new constitutional right to cultivate marijuana or to repeal "longstanding laws" prohibiting that practice. Id. at 243. Because the text of the amendment did not clearly suggest it intended to displace such long-standing regulations, the Court held the defendant's marijuana cultivation was not a "farming practice" protected by article I, section 35. Id.
Here, captive cervid enterprises such as those operated by Respondents have been closely regulated for nearly a century, first by statute and later by regulations adopted by the Commission under article IV, section 40(a).[14] The Court cannot conclude the voters intended to overthrow this *474 longstanding regulatory pattern by adopting article I, section 35, when there is no language in this provision to suggest they did so. Accordingly, the Court holds Respondents are not engaged in a "farming [or] ranching practice" within the meaning of that provision. Appellants' Point II is granted.
Conclusion
For the reasons set forth above, the circuit court's judgment in favor of Respondents is reversed and, pursuant to Rule 84.14, judgment is entered in favor of Appellants on all counts.
All concur.

Don Bedell, James Blair, Marilynn Bradford, and David Murphy.

Evidence in the record shows Respondent Broadway thereafter had only four cervids on his hunting preserve and was prohibited from introducing new cervids until July 2017. There has not been a white-tailed deer hunt on the Winter Quarters property during Respondent Broadway's ownership, and he is currently prohibited from breeding white-tailed deer.

Notwithstanding this reasoning, the Respondents did not challenge-and the circuit court expressly did not prevent the Commission from enforcing-those regulations governing captive cervid operations that were in effect prior to January 2015.

Respondents Grace and Whitetail Sales and Service, LLC were not plaintiffs to this second count. Before trial, the other Respondents sought leave to add Respondents Grace and Whitetail Sales and Service, LLC as plaintiffs. The circuit court permitted their addition as plaintiffs to the first count (concerning the Commission's power under article IV, section 40(a) ), but not to the second count (concerning the right to farm under article I, section 35 ).

See also Restatement (Second) of Torts § 506(1) (1977) ("A wild animal ... is an animal that is not by custom devoted to the service of mankind at the time and in the place in which it is kept."); Union Pac. R.R. Co. v. Nami , 498 S.W.3d 890, 896 (Tex. 2016) ("The common law divides animals into two groups: animals domitae naturae or mansuetae naturae -that is, tame or tamed, domestic animals-and animals ferae naturae -that is, wild, usually found at liberty."); Webster's Third New International Dictionary 2616 (1966) ("wildlife" are "living things that are neither human nor domesticated"); id. at 671 (to "domesticate" is to "adapt (an animal or plant) in intimate association with and to the advantage of man or another species usu. by ... selective breeding during generations of living in association").

By the early 1900s, "several large farms in ... Missouri" were "furnishing numbers of deer" raised in captivity. The Country Gentleman, Vol. LXXIV, p. 576 (June 10, 1909). One of these farms was run by Mr. C.H. Roseberry, who was then fairly prominent in the deer farming world. See id. (referring to Roseberry as one of "the largest producers"). Mr. Roseberry had substantial experience with raising and domesticating deer in Missouri, and it seems he sold his deer "almost exclusively [as] pets and for propagating purposes, although a few surplus bucks [were] sold for venison." The Country Gentleman, Vol. LXXIV, p. 1002 (Oct. 21, 1909). At the same time, individuals and associations were also placing cervids in private preserves. For example, the St. Louis Park and Agriculture Company then had "about 1,000 deer and 400 elk in [its] 5,000-acre preserve in Taney County." D.E. Lantz, Deer Farming in the United States 18 (1908) (farmers' bulletin issued by U.S. Department of Agriculture). Some cervids were held in private preserves for sport; others were held for conservation, because cervid populations were exceedingly low around that time. See id. at 13 (noting deer were "practically" extinct in the Midwest). Moreover, such operations were not unique to Missouri. See generally John Dean Caton, The Antelope and Deer of America 276-309 (1881) (commenting on experiences with raising and domesticating various types of captive cervids, including moose, caribou, elk, mule deer, black-tailed deer, and white-tailed deer); Lantz, supra , at 10-18 (commenting on experiences of elk and deer breeders and private preserve owners). In fact, by that time, deer had been hunted in enclosed parks and raised in captivity for centuries. See generally J. Birrell, Deer and Deer Farming in Medieval England, 40 Ag. Hist. Rev. 112 (1992); E.P. Shirley, Some Account of English Deer Parks with Notes on the Management of Deer (1867).

See, e.g., § 8299, RSMo 1929, p. 2349, (no one may "maintain a game farm for raising deer and elk ... without first obtaining a license," and those with a license may not use "domesticated game raised or held in captivity" to frustrate the "enforcement [of] laws relating to ... wild game") (punctuation altered).

This definition is substantially similar to the definition of "wildlife" provided in federal law. See 16 U.S.C. § 3371(a) ; see also 18 U.S.C. § 42(a)(2). Under that definition, an animal is "wildlife" if the species to which that animal belongs (rather than the individual animal itself) is "wild." See United States v. Wainwright , 89 F.Supp.3d 950, 953 (S.D. Ohio 2015). In light of this definition, federal courts have had no difficulty concluding all deer-even those raised and domesticated in captivity-are "wildlife." See, e.g., United States v. Condict , No. CR-05-004, 2006 WL 1793235, at *4 (E.D. Okla. June 27, 2006) ("[T]he Court finds that the term 'wildlife' as used in the Lacey Act includes 'farm raised domesticated deer.' "); Wainwright , 89 F.Supp.3d at 953.

To be clear, the Court rejects Respondents' many arguments to the contrary, including their claim an animal is not "game" or "wildlife" unless it is in the wild and has not been brought under the dominion or control of man. Confining a member of a species does not change the nature of that species and, therefore, does not remove the captured member from the category of "wildlife" subject to regulation under article IV, section 40(a). The Court also rejects Respondents' argument that the Court should reject the construction of the terms "wildlife" and "game" supported by the history and context set forth above merely because this might create an inconsistency with the use of those terms in wholly unrelated fields such as tort or property law. See, e.g., Oak Creek Whitetail Ranch, L.L.C. v. Lange , 326 S.W.3d 549, 550 (Mo. App. 2010) (holding Respondent Hill's breeder deer are "domestic animals" under § 273.020, RSMo 2000, which places liability on a dog's owner or keeper when the dog kills or maims "domestic animals"). Perfect consistency among every utterance of the words "wildlife" and "game" is not required. Instead, the Court is satisfied the holding in this case is based upon an informed understanding of what the voters who approved article IV, section 40(a), would have understood those terms to mean in that context at that time.

See also Missouri v. Holland , 252 U.S. 416, 434, 40 S.Ct. 382, 64 L.Ed. 641 (1920) ("To put the [state's power over wild birds] upon title is to lean upon a slender reed. Wild birds are not in the possession of anyone; and possession is the beginning of ownership. The whole foundation of the [state's power over wild birds] is the[ir] presence within [its] jurisdiction...."); Toomer v. Witsell , 334 U.S. 385, 402, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948) ("The whole ownership theory, in fact, is now generally regarded as but a fiction...."); Hughes , 441 U.S. at 343 n.5, 99 S.Ct. 1727 (pointing out the most prominent 19th century case to mention the state's "ownership" of wildlife within its borders "did not use the term 'ownership' in any proprietary sense") (Rehnquist, J., dissenting) (citation omitted).

Respondents suggest this statute supports their reading on the ground that the use of different terminology ("of" and "within") suggests the word "of" should not convey the same meaning as the word "within." The Court disagrees. The words "of" and "within" are clearly redundant here. This is a classic example of lawmakers repeating themselves because of "a lawyerly penchant for doublets"-like "aid and abet, cease and desist, [and] null and void." King v. Burwell , --- U.S. ----, 135 S.Ct. 2480, 2498, 192 L.Ed.2d 483 (2015) (Scalia, J., dissenting).

This Court, too, has consistently refused to read ownership requirements into statutory language plainly intended to be broad and inclusive. See Reid v. Ross , 46 S.W.2d 567, 569 (Mo. banc 1932) (phrase "any of the waters of this state" was "broad and all-inclusive" enough to apply to private waters and was limited only by express statutory exemptions for certain privately owned waters); State v. Taylor , 358 Mo. 279, 214 S.W.2d 34, 37-38 (Mo. 1948) (defendant properly convicted of using explosives to kill fish in "any of the waters of this state" even though he only dynamited fish in a private pond).

The reference in article I, section 35, to article VI, by itself, is not sufficient. See Shoemyer v. Mo. Sec'y of State , 464 S.W.3d 171, 175 (Mo. banc 2015) ("[T]he omission of a reference to limitations by article VI in the [ballot] summary is not problematic as each section of the constitution is subject to limitations that may be found elsewhere in the constitution.").

As noted above, prior to the adoption of article IV, section 40(a), the legislature enacted several game laws governing the operation of captive cervid enterprises. No one could breed captive game, including deer and elk, without first obtaining a license. See § 8299, RSMo 1929, p. 2349 ("The issuance of [game breeding] licenses shall be discretionary with the state game and fish commissioner...."). Even if someone received a license, it could be revoked by the state game and fish commissioner "at his will and pleasure." Id. After the adoption of article IV, section 40(a), the Commission employed a similar scheme: No one could breed captive game, including deer and elk, without a permit and the issuance of a permit was determined by the Commission in its "sole discretion" only when it was satisfied the applicant: (a) would secure the game "from a source other than the wild stock in this state;" (b) was "equipped to confine such game for public safety;" and (c) was able "to prevent wild game from becoming part of the enterprise." Wildlife Code § 82, p. 35 (1941). The Commission retained the authority to revoke these permits, in its "discretion," if the permit holder was using his or her operation to frustrate "the enforcement of [the Commission's] regulations." Id. The same was true for the operation of hunting preserves containing big game. It was not until 1973 that the Commission allowed private parties to operate hunting preserves with elk and certain types of deer, and it was not until 1985 that the Commission allowed private parties to operate hunting preserves containing white-tailed deer.