

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| SARCOXIE NURSERY CULTIVATION CENTER, LLC, et al., | ) ) ) | |
| Appellants, | ) ) | |
| v. | ) ) | WD84492 |
| RANDALL WILLIAMS, et al., Respondents. | ) ) ) | FILED: May 3, 2022 |

**Appeal from the Circuit Court of Cole County
The Honorable Patricia S. Joyce, Judge**

**Before Division Two: Alok Ahuja, P.J., and
Edward R. Ardini, Jr. and Thomas N. Chapman, JJ.**

The Appellants in this case are Sarcoxie Nursery Cultivation Center, LLC, Sarcoxie Nursery Infusion, LLC, Missouri Medical Manufacturing, LLC, Missouri Medical Products, LLC, and GVMS, Inc. The Appellants unsuccessfully applied for licenses from the Department of Health and Senior Services to cultivate, manufacture, and/or dispense marijuana and marijuana-infused products for medicinal purposes. After their license applications were denied, Appellants filed a petition for declaratory judgment in the Circuit Court of Cole County. In their lawsuit, Appellants challenged the regulations which limit the total number of medical marijuana facility licenses the Department will issue. The circuit court rejected Appellants' challenges, and upheld the Department's numerical limits on licenses. The Appellants appeal. We affirm.

**Factual Background**

On November 6, 2018, Missouri voters approved an amendment to the Missouri Constitution which legalized the cultivation, manufacture, and distribution of marijuana and marijuana-infused products for medicinal purposes. The amendment is codified as Article XIV of the Missouri Constitution.

Article XIV vests the Department of Health and Senior Services with the authority to

> [p]romulgate rules and emergency rules necessary for the proper regulation and control of the cultivation, manufacture, dispensing, and sale of marijuana for medical use . . . so long as patient access is not restricted unreasonably and such rules are reasonably necessary for patient safety or to restrict access to only licensees and qualifying patients.

Art. XIV, § 1.3(1)(b).

Article XIV gives the Department authority to administer a licensing program for medical marijuana-related facilities. The Department is authorized to "[g]rant and refuse state licenses and certifications for the cultivation, manufacture, [and] dispensing" of medical marijuana, and to "suspend, fine, restrict, or revoke such licenses and certifications" for violations of Article XIV or the Department's implementing regulations. Art. XIV, § 1.3(1)(a).

Article XIV also gives the Department the authority to "restrict the aggregate number of licenses granted" for medical marijuana cultivation, manufacturing, and dispensary facilities. Art. XIV, §§ 1.3(15)-(17). Article XIV limits the Department's authority in this regard, however: it specifies that cultivation licenses cannot be limited to fewer than one license per one hundred thousand Missouri residents; that licenses for marijuana-infused products manufacturing facilities cannot be restricted to fewer than one per seventy thousand Missouri residents; and that the number of dispensary licenses cannot be limited to fewer than twenty-four in each of the eight United States congressional districts existing in the State as of

2

December 6, 2018. *Id.* The 2010 United States Census reported that the population of Missouri was 5,998,927. Given the 2010 Census data, the parties agree that Article XIV prohibited the Department from authorizing fewer than: sixty licenses for cultivation facilities; eight-six licenses for marijuana-infused product manufacturing facilities; and 192 licenses for dispensaries.

After Article XIV was passed by voters, the Department sought public input and guidance from a wide variety of individuals and groups before beginning the formal regulatory process. Department officials testified at trial that they had an "open-door policy" which permitted "anybody . . . to submit their thoughts and ideas," without regard to whether a lobbyist or attorney was involved. The Department posted various drafts and revisions of its contemplated rules on its website, and issued press releases alerting the public when a new version of the rules was published. The rules were also sent to other agencies and to stakeholder groups for comment.

In May 2019, the Department proposed three regulations which limited the total number of licenses for cultivation facilities to sixty, the total number of licenses for marijuana-infused products manufacturing facilities to eighty-six, and the total number of dispensary facilities to 192 – the minimum number of licenses required to be issued by Article XIV, §§ 1.3(15)-(17). *See* 44 MO. REG. 1911, 1914, 1922 (July 1, 2019) (proposing rules to be codified at 19 C.S.R. 30-95.050(1)(A), 30-95.060(1)(A), all 30-95.080(1)(A)-(B)). The regulations provided that the limits could be increased in the future "in order to meet the demand for medical marijuana by qualifying patients." *Id.* The three regulations were promulgated as emergency rules effective on June 3, 2019. *See* 44 MO. REG. 1818-19, 1822 (July 1, 2019). The final regulations became effective on January 30, 2020. *See* 44 MO. REG. 3142-43 (Dec. 2, 2019) (Orders of Rulemaking).

Department officials testified at trial that they were required to build a new regulatory agency and regulatory framework "from scratch," and on the expedited timetable dictated by Article XIV. The Department investigated the experience of other States which had legalized marijuana for medical or recreational purposes. The Department recognized that it could not simply take data from other States and directly apply it to Missouri, but found the out-of-state information to be "helpful" nonetheless. Department officials testified that they looked to other States, such as Colorado and Oklahoma, which had opened their marijuana marketplaces with minimal regulations. Missouri officials considered Oklahoma's experience, in particular, to have been "a disaster." They testified that Oklahoma is "going through it right now, trying to put the genie back in the bottle [because it did not] start from a well-regulated, controlled system." The Department thus adopted the mindset that "[it] can make the incision bigger, but [it] can't make it smaller."

Department officials testified that their "North Star" in developing regulations was patients, and ensuring that they had sufficient access to safe medical marijuana. The Department considered the competitiveness of dispensaries, geographic factors, and economic considerations in determining whether the regulations would afford sufficient patient access to medical marijuana. Given Article XIV's emphasis on patient access, Department officials questioned whether it was appropriate to put _any_ numerical limits on licenses. However, Department officials testified that an additional "major concern" was preventing the diversion of excess medical marijuana into the already-existing black market, which the Department has a "regulatory duty to . . . prevent." *See* Art. XIV, § 1.3(1)(b).

To assist it in formulating its rules, the Department commissioned a study from economists at the University of Missouri to estimate supply and demand. The market study, known as "the Haslag study," looked to other States to provide estimates on both supply and demand within the Missouri market.

4

The Haslag study estimated with 66% percent confidence that the number of patients seeking access to medical marijuana products in the first year of the program would be approximately 20,000.

Following their own investigations, however, Department officials concluded that the Haslag study had substantially underestimated the likely patient population, and "didn't align with what [the Department had been] hearing." The Department instead based its "demand" estimates on a figure "heard from multiple sources," that a "robust medical marijuana market would be about 3 percent of the population." The population of Missouri as of the 2010 United States Census was 5,998,927; based on that figure, the Department estimated that approximately 180,000 Missourians would become patients. The Department assumed that all 180,000 patients would purchase the maximum allowable quantity of marijuana, or three pounds per year, even though it expected that approximately one-third of patients would engage in the home cultivation authorized by Article XIV.

Because the Department concluded that the patient-population and demand projections in the Haslag study were substantially understated, it adopted license limitations substantially higher than the number of cultivation, manufacturing, and dispensary facilities which the Haslag study opined would be necessary to satisfy patient demand through 2022.

Although it did not rely on the Haslag study's estimate of marijuana demand, the Department relied on the Haslag study's information concerning the "supply side," particularly its estimate of the per-square-foot production capacity of marijuana cultivation facilities. The study indicated that "indoor cultivators would be capable of producing .5 pounds per square foot annually." The Department applied that productivity estimate to the minimum number of cultivation facilities required to be licensed by Article XIV, or sixty facilities. Assuming each facility operated at its maximum allowable capacity of 30,000 square feet, sixty facilities

would produce approximately 900,000 pounds of marijuana annually. At trial in October 2020, Department officials testified that their more recent projections were tracking with the pre-rule estimates of production from cultivation facilities.

Given the potential for significant excess supply, Department officials testified that they did not believe that limiting the number of cultivation licenses would have the effect of unreasonably limiting patient access. They testified that the Department would "continuously or periodically" reanalyze the limitations "in order to meet patient demand." Department officials also testified to their belief that, in the beginning of its new regulatory program, a limitation on the number of licensees would better allow for the "seed-to-sale" tracking of medical marijuana required by Article XIV, and would also ensure better quality control and safety for patients.

The Appellants applied to the Department for cultivation, manufacturing, and/or dispensary licenses, but were rejected. Following their unsuccessful applications, and unsuccessful appeals to the Administrative Hearing Commission, Appellants brought suit against the Department, seeking a declaratory judgment that the license limits unreasonably restricted patient access, and "impose[d] an undue burden on . . . qualifying patients," in violation of Article XIV, §§ 1.3(1)(b) and 1.3(25). Appellants also alleged that the limitations on medical marijuana-related licenses conflicted with Article I, § 35 of the Missouri Constitution, the so-called "Right to Farm" amendment.

In addition to challenging the numerical license limitations, in the circuit court the Appellants also challenged the scoring criteria the Department employed in evaluating license applications, and the manner in which the Department reviewed applications and awarded licenses. On appeal, however, Appellants' arguments challenge only the Department's numerical limitations on the total

number of licenses to be awarded to cultivation, manufacturing, and dispensary facilities.

The case was tried to the circuit court on October 29 and 30, 2020. Appellants adduced evidence that, at the time of trial, only four dispensaries were operational in the State. Department officials admitted that there was then an "insufficient supply" of medical marijuana to meet the demands of patients. Department officials testified, however, that many more facilities had been licensed than were operational at the time of trial, and that licensees had until the end of 2020 to commence operations. Department officials testified to their expectation that, as more of the licensed facilities began operating, supply and access would substantially improve.

The circuit court issued its thirty-seven-page judgment upholding the Department's regulations on December 21, 2020. The circuit court found that, before issuing its regulations, "the Department considered both the potential positive and negative impacts of licensing limitations with regard to medical marijuana." The court observed that the limitations "were put in place after thoughtful deliberation of both their constitutionality and practical effect." The court found that the Department had engaged in an open public rulemaking process in which it published multiple iterations of its proposed rules, and solicited and obtained comments from a variety of interested communities and subject-matter experts. The court found that, in promulgating its regulations, the Department had considered the potential supply of, and demand for, medical marijuana, as well as issues of geographic access, patient safety, potential diversion to the illicit market, impact on economically depressed communities, and regulatory cost and effectiveness.

The circuit court declared that "[t]he plain language of art. XIV, § 1 of the Missouri Constitution expressly contemplates licensing limitations and authorizes

7

the Department to implement such limits, if it so chooses." The court found that the facility license limitations "fall squarely within [the Department's] constitutional delegation of authority" and "do not conflict with the plain language of Missouri Law and Constitution."

The circuit court also held that the limitations "bear a rational relationship to legitimate government interests" in limiting crime, effectively regulating the medical marijuana marketplace, avoiding the costs associated with excess marijuana production, and ensuring patient safety.

The circuit court explained that the limitation on facility licenses was rationally related to the purpose of avoiding diversion of marijuana into the illegal market. It noted that Department officials

> testified that the risk of allowing unfettered production creates an excess of legally produced marijuana, which may be diverted to the black market. Even at the constitutionally approved minimum number of facility licenses, the capacity for legal marijuana production will greatly exceed the demand for medical marijuana based on both the projected and actual numbers of licensed qualified patients. Allowing production and distribution above the license limitation would only exacerbate the risk of diversion into the black market.

The court also found that "excess marijuana supply would create additional costs for the State, such as additional enforcement activity to ensure the product is not sold illicitly and further regulation of the destruction of excess product."

The court observed that patient safety could be threatened if the Department failed to impose limits on the number of licensed facilities:

> As the number of licensees increase[s], the effectiveness of governmental oversight and regulation decreases, and patients are put at risk. When promulgating regulations, the Department considered not only whether such a rule unreasonably restricted access for patients, but also patients' safety. Mo. Const., art. XIV § 1.3(1)(b). Therefore, limiting the number of licenses available for cultivation, manufacture, and dispensing of medical marijuana allows for the proper and active regulation of the controlled substance within the medical marijuana marketplace from cultivation to manufacture to

8

dispensing. This ensures patient safety. Conversely, removing limits on the number of licenses related to medical marijuana requires a finite amount of governmental resources to regulate an ever-expanding field of licensees. This harms patient safety.

The court noted that the governmental resources required to regulate licensees would increase disproportionately if licensing limitations were relaxed, because "[i]f there were no licensing limitations, then progressively less qualified applicants" – who require greater regulatory oversight – would become licensees. "Therefore, limiting the number of licenses issued is reasonably related to the dual interest of proper regulation and patient safety."

The court also found that the Right to Farm amendment (Mo. Const. Art. I, § 35) does not apply to the cultivation of medical marijuana in light of the Missouri Supreme Court's decision in *State v. Shanklin*, 534 S.W.3d 240, 242 (Mo. 2017). Even if the Right to Farm amendment was applicable, the court held that the explicit authority given to the Department to limit the number of medical marijuana-related licenses, in the later-enacted Article XIV, would prevail over the Right to Farm amendment.

Appellants appeal.

### Standard of Review

> Appellate review of the circuit court's decision following bench trial is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Under *Murphy*, the circuit court's decision will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Id.* For factual disputes, the evidence and all reasonable inferences from the evidence are "viewed in the light most favorable to the trial court's judgment, and all contrary evidence and inferences must be disregarded." *Miller v. Gammon & Sons, Inc.*, 67 S.W.3d 613, 618 (Mo. App. W.D. 2001) (internal quotation omitted).

*B.K. v. Missouri State Highway Patrol*, 561 S.W.3d 876, 879 (Mo. App. W.D. 2018).

Statutory, regulatory, and constitutional interpretation are issues of law reviewed *de novo*. *Finnegan v. Old Republic Title Co. of St. Louis, Inc.*, 246 S.W.3d

9

928, 930 (Mo. 2008); *Blankenship v. Franklin Cnty. Collector*, 619 S.W.3d 491, 501 (Mo. App. E.D. 2021) (quoting *St. Louis Police Leadership Org. v. City of St. Louis*, 484 S.W.3d 882, 888 (Mo. App. E.D. 2016)).  In ascertaining the meaning of a statute, regulation, or constitutional amendment, "the primary rule is to 'give effect to [legislative or departmental intent, or] to the intent of the voters who adopted the Amendment' by considering the plain and ordinary meaning of the word[s]" used. *Johnson v. State*, 366 S.W.3d 11, 25 (Mo. 2012); *Parktown Imports, Inc. v. Audo of Am., Inc.*, 278 S.W.3d 670, 672 (Mo. 2009).  Interpretation is "not to be hyper-technical, but instead is to be reasonable [and] logical." *Gash v. Lafeyette Cnty.*, 245 S.W.3d 229, 232 (Mo. 2008).   In interpreting a constitutional amendment, respect should be given to its "broader purposes and scope." *Brown v. Morris*, 290 S.W.2d 160, 167 (Mo. 1956).  Similar to statutes, constitutional amendments should be "viewed in harmony with all related provisions, considered as a whole." *Missouri Prosecuting Att'ys v. Barton Cnty.*, 311 S.W.3d 737, 742 (Mo. 2010) (citation omitted).

The party seeking to invalidate a regulation as unconstitutional bears the burden of proof, and must "show that it bears no reasonable relationship to the [constitutional amendment's] objective." *Valley Park Props., LLC v. Mo. Dep't of Nat. Res.*, 580 S.W.3d 607, 612 (Mo. App. E.D. 2019) (quoting *State ex rel. Missouri Public Defender Com'n v. Waters*, 370 S.W.3d 592, 603 (Mo. 2012)).  Regulations are presumed valid and "may not be overruled except for weighty reasons." *Id.*

## Discussion

### I.

In their first Point, Appellants argue the circuit court's determination that "the Department's regulations fall squarely within its constitutional delegation of authority" is erroneous because the circuit court failed to consider other provisions of Article XIV which limit the Department's ability to establish license limitations.

10

Appellants argue that the court should have found that the Department's license limits are unreasonably restrictive of patient access, "impose an undue burden" on qualifying patients, and "undermine the purposes" of Article XIV. Points III and IV raise similar arguments, contending that the circuit court erroneously declared and applied the law, and ruled against the weight of the evidence, when it concluded that the Department's regulations bear a rational relationship to a legitimate government interest and are not arbitrary and capricious. We address these Points together.

On its face, Article XIV, §§ 1.3(15) through (17) of the Missouri Constitution expressly authorize the Department to limit the number of licenses to be granted for cultivation, marijuana-infused products manufacturing, and dispensary facilities. Section 1.3(15) authorizes the Department to "restrict the aggregate number of licenses granted for medical marijuana cultivation facilities" to no fewer "than one license per every one hundred thousand inhabitants"; § 1.3(16) permits the Department to limit manufacturing facility licenses to no fewer than one per seventy thousand residents; and § 1.3(17) authorizes the Department to limit dispensary licenses to no fewer than twenty-four in each of Missouri eight congressional districts. The parties agree that the limitations imposed by 19 C.S.R. 30-95.050(1)(A), 30-95.060(1)(A), and 30-95.080(1)(A)-(B) comply with the authority granted by Article XIV, §§ 1.3(15) through (17), based on the Missouri population figures reported in the 2010 United States census.

Appellants' real complaint is not with the circuit court's conclusion that the Department was constitutionally authorized to impose numerical limits on the total number of facility licenses. Instead, Appellants seize on the circuit court's statement that Article XIV, § 1 "authorizes the Department to implement such [license] limits, *if it so chooses*." (Emphasis added.) According to the Appellants,

11

the circuit court's judgment gives the Department *carte blanche* to restrict the number of medical marijuana facility licenses "on a whim."

By seizing on a single phrase, from a single sentence, of the circuit court's thirty-seven-page judgment, Appellants' argument relies on a distorted caricature of the court's decision. The circuit court plainly recognized that, under Article XIV, the Department of Health and Senior Services is required to consider a number of factors before limiting the total number of medical marijuana facility licenses, including patient access, patient safety, and the risk of diversion of legally produced marijuana into the black market. Moreover, in findings the Appellants do not seriously challenge, the circuit court found that the Department <u>had</u> in fact given careful consideration to these factors, by consulting with the general public, interested stakeholders, and subject-matter experts, and by reviewing the experience of other States who have instituted medical or recreational marijuana programs. The circuit court found that, based on its investigations, the Department concluded that the licensing limits it imposed best balanced the needs for patient access, patient safety, minimizing the risk of diversion of excess production, and minimizing the cost of regulation while increasing its effectiveness.

On this record, the circuit court correctly concluded that the Department had not acted arbitrarily and capriciously, and that its regulations bear a rational relationship to the objectives of Article XIV. In cases such as this "where regulations 'concern matters of economics, business and social policy' as opposed to fundamental rights, 'the appropriate standard of review is whether the regulation in question bears any rational relationship to a legitimate legislative [or constitutional] goal.'" *Psychiatric Healthcare Corp. of Missouri v. Dep't of Soc. Servs.*, 100 S.W.3d 891, 905 (Mo. App. W.D. 2003) (quoting *Gray v. City of Florissant*, 588 S.W.2d 722, 725 (Mo. App. E.D. 1979); internal alterations removed).

12

Under rational basis review, regulations are presumed to have a rational basis. *State v. Young*, 362 S.W.3d 386, 397 (Mo. 2012). "Rational basis review . . . does not require that the fit between the [regulation] and government interest be exact, but merely 'reasonable.'" *Glossip v. Mo. Dep't of Transp. & Hwy. Patrol Employees' Ret. Sys.*, 411 S.W.3d 796, 807 (Mo. 2013) (citation omitted). "[T]his Court will not substitute its judgment for that of the legislature [or rule-making authority] as to 'the wisdom, social desirability or economic policy underlying a statute [or rule].'" *Missouri Prosecuting Att'ys & Cir. Att'ys Ret. Sys. v. Pemiscot Cnty.*, 256 S.W.3d 98, 102 (Mo. 2008) (quoting *Kohring v. Snodgrass*, 999 S.W.2d 228, 233 (Mo. 1999)). "[U]nder a rational basis test, the Court does not have to determine whether the [administrative agency] 'should have' done something different or whether there is a better means to accomplish the same goal, and certainly not whether the chosen means is the best method." *Linton v. Mo. Veterinary Med. Bd.*, 988 S.W.2d 513, 516 (Mo. 1999). The party challenging the regulation bears the burden of "overcom[ing] this presumption [of validity] by a 'clear showing of arbitrariness and irrationality.'" *Amick v. Dir. Of Revenue*, 428 S.W.3d 638, 640 (Mo. 2014) (quoting *Foster v. St. Louis County*, 239 S.W.3d 599, 602 (Mo. 2007)); *see Miss Kitty's Saloon, Inc. v. Mo. Dep't of Revenue*, 41 S.W.3d 466, 467 (Mo. 2001) (requiring challenge to show legal provision "does not rest upon any reasonable basis and is purely arbitrary").

Regulations are arbitrary and capricious only where they are based on "willful and unreasoning action, without consideration of and in disregard of the facts and circumstances[.]" *Psychiatric Healthcare Corp. of Mo. v. Dep't of Social Servs.*, 100 S.W.3d 891, 900 (Mo. App. W.D. 2003); *Barry Serv. Agency v. Manning*, 891 S.W.2d 882, 892 (Mo. App. W.D. 1995) (finding an agency has acted "arbitrarily and capriciously" when it "completely fails to consider an important aspect or factor of the issue" before promulgating rules (citation omitted)).

13

"Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which [the legislature] has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Beverly Enterps.-Mo. Inc. v. Dep't of Soc. Servs.*, 349 S.W.3d 337, 345 (Mo. App. W.D. 2008) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The circuit court did not err in concluding that Appellants had failed to demonstrate that the Department's regulations lacked a rational connection to the facts revealed by the Department's investigations, or that the Department had failed to consider, or had disregarded, important factual considerations. The purpose of Article XIV, in part, is "to allow for the *limited* legal production, distribution, sale and purchase of marijuana for medical use." Article XIV, § 1.1 (emphasis added). The Department has authority to "[p]romulgate rules . . . necessary for the proper regulation and control of . . . [medical] marijuana . . . so long as patient access is not restricted unreasonably and such rules are reasonably necessary for patient safety or to restrict access to only licensees and qualifying patients." Article XIV, § 1.3(1)(b). While Appellants are correct that "[p]atient access" is emphasized in Article XIV, so too is "patient safety" and "restrict[ing] access to only licensees and qualifying patients." We cannot find that the Department acted irrationally, or arbitrarily and capriciously, to restrict patient access when its regulations authorize cultivation of marijuana in amounts which will produce annual expected surpluses of hundreds of thousands of pounds of marijuana. It is also significant that, in estimating likely demand for medical marijuana and the number of licensed facilities necessary to satisfy that demand, the Department predicted a total patient population almost a full order of

14

magnitude greater than the estimates contained in the expert study it had commissioned.

It also bears emphasis that the cultivation, manufacture, distribution, sale, transport, and possession of marijuana for non-medical purposes remains illegal under both Missouri and federal law. *See generally* chapter 579, RSMo. Article XIV declares in its opening section that it "it is not intended to change current civil and criminal laws governing the use of marijuana for nonmedical purposes." Art. XIV, § 1.1. Preventing diversion of licensed medical marijuana into the illegal market serves legitimate and important governmental objectives. *See, e.g.*, *State v. Clay*, 481 S.W.3d 531, 535-36 (Mo. 2016) ("The State has a compelling government interest in 'ensuring public safety and reducing . . . crime . . . .'" (citation omitted)).

Patient safety is also a legitimate government interest that supports the Department's license limitations. The Missouri Supreme Court has declared that "[t]he preservation of the public health is a paramount end of the exercise of the police power of the state." *Mahoney v. Doerhoff Surgical Servs., Inc.*, 807 S.W.2d 503, 507 (Mo. 1991); *see also, e.g.*, *Artman v. State Bd. of Reg. for Healing Arts*, 918 S.W.2d 247, 252 (Mo. 1996); *Mo. Veterinary Med. Bd. v. Gray*, 397 S.W.3d 479, 481-82 (Mo. App. W.D. 2013) (citing *Moler v. Whisman*, 147 S.W. 985 (Mo. 1912)); *City of Kansas City v. Jordan*, 174 S.W.3d 25, 40-41 (Mo. App. W.D. 2005). The Department did not act irrationally in concluding that, at the outset of this new regulatory program, it would ensure the most effective regulatory oversight, and thus be most protective of patient safety, to authorize a more limited number of more highly qualified licensees, rather than allowing a larger (or even unrestricted) number of licensees to overwhelm the available regulatory resources. Department officials testified that "there's much more involved than just adding an investigator" to meet the regulatory demands of additional licensed facilities, particularly in light of the "seed-to-sale tracking program" which Article XIV requires.

Appellants emphasize that, at trial, Department officials acknowledged that only a small number of licensed facilities were in operation, and that – as of trial on October 29-30, 2020 – the supply of marijuana was insufficient to meet patient demand. The significance of these concessions is limited: Department officials also testified that licensees had been given until the end of 2020 to commence operations, and that the Department expected supply problems to ease as more of the authorized facilities came on-line.

In addition, Appellants' focus on the state of affairs in October 2020 ignores that the Department proposed its rules, and adopted them on an emergency basis, more than a year earlier, in May and June 2019. At the time it adopted its rules, the Department was necessarily required to rely on forward-looking predictions and forecasts of expected patient demand for medical marijuana, and of the likely production capacity of cultivation facilities. "Agency rulemaking [is] the formulation . . . of a 'statement of general applicability that implements, interprets or prescribes law or policy, or that describes the organization, procedure, or practice requirements of any agency.'" *Greenbriar Hills Country Club v. Dir. of Revenue*, 47 S.W.3d 346, 357 (Mo. 2001) (citing section 536.010(4)). Rule-making "regulates the future conduct of either groups of persons or a single person; it is essentially legislative in nature, not only because it operates in the future but also because it is primarily concerned with policy considerations." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 218–19 (1988) (Scalia, J., concurring) (citing ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 13-14 (1947)).

Because agency regulations are forward-looking, caselaw recognizes that agencies promulgating rules may properly rely on predictions and forecasts, so long as those predictions or forecasts are reasonably based on the available facts.

> Since regulatory functions must necessarily contemplate the future, the law which is involved in those functions must . . . be

16

> realistic enough to permit that scope. So, when a prospective rule is
> required to be upon evidence, that evidence must be construed to
> include estimates, or forecasts, or opinions, on future events. At the
> same time, governmental [predictions] for the future cannot be
> fashioned from pure fantasy, speculation devoid of factual premise. . . .
> [T]he function of the agencies to which [the legislature] has delegated
> these responsibilities is to examine the relevant past and present and
> then to exercise a rational judgment upon that data to ascertain the
> public convenience and necessity in the reasonably foreseeable future.

*Am. Airlines, Inc. v. Civil Aeronautics Bd.*, 192 F.2d 417, 421 (D.C. Cir. 1951); *see also*, *e.g.*, *United States Telecom Ass'n v. Fed. Communics. Comm'n*, 825 F.3d 674, 707 (D.C. Cir. 2016) ("[a]n agency's predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to particularly deferential review, as long as they are reasonable."; citation omitted); *Midwest Television, Inc. v. Fed. Communics. Comm'n*, 426 F.2d 1222, 1228 (D.C. Cir. 1970).

The circuit court found that the Department based its estimates of marijuana production capacity and likely demand on a study by University of Missouri economists, and based on the Department's investigation of the experience in other States which had implemented recreational and medicinal marijuana programs. Notably, the Department's estimate of the future patient population was almost ten times *greater* than the estimates contained in the Haslag study – thus, the Department formulated its regulations based on expected demand far greater than that which its retained experts had forecast.

It also bears emphasis that legalized supply of marijuana to the public, for either recreational or medicinal purposes, is a relatively new – and rapidly evolving – phenomenon. In this context, we cannot say that the Department's predictions were "pure fantasy" or "speculation" – they were instead reflective of a "rational judgment" exercised on the available data. *Am. Airlines*, 192 F.2d at 421. Even if the Appellants had shown that some of the Department's predictions had proven to be inaccurate, this would not by itself operate to invalidate the Department's rules,

when those predictions were rationally based on the available information, and involved an industry and legalized product being newly introduced into the State.

Besides the fact that Appellants' arguments do not address the factual record available to the Department *when it formulated its rules*, Appellants' focus on subsequent events suffers from an additional flaw: it effectively challenges the manner in which the Department *implemented* its licensing system and awarded licenses, rather than the regulations establishing the licensing scheme itself. For example, the way in which licensed medical marijuana dispensaries are geographically dispersed within a particular Congressional district is not necessarily a function of the total number of licenses which were authorized by the Department's rules, but is instead a function of the way in which the Department *implemented* those rules, and selected the individual applicants to whom licenses would be issued. Although the Appellants' Amended Petition may have challenged the manner in which the Department evaluated license applications and awarded licenses, in this appeal the Appellants do not meaningfully challenge the Department's *implementation* of its licensing scheme, but instead only the *design* of the licensing system itself. Appellants' arguments concerning the distance to the nearest dispensary from particular locations in the State, as of October 2020, miss the mark.

Appellants also repeatedly contend that the Department failed to consider the effect that the license limitations would have on the price of marijuana, and therefore on patient access to affordable medical marijuana products. Appellants fail to mention, however, that the Department official whose testimony they highlight specifically testified that "the home grow portion that was put in the amendment was a huge consideration to help remedy some of the below-income and the price issues and even access issues. That was put in there specifically to help address those things." Further, the Haslag study specifically noted that, to ensure

18

reasonable patient access, the regulatory regime "must not result in the price of legal, medical marijuana being prohibitively expensive in Missouri." The testimony indicated that marijuana pricing in Missouri was "very similar to other states when they first opened." The Haslag study noted that in Colorado, in approximately three years, the price of legal marijuana fell by 60%, reflecting the elimination of the "risk premium" associated with producing and distributing an illegal product, the increasing maturity of the legal marijuana marketplace, and productivity gains as cultivators and manufacturers gained experience. Department officials testified that they expected the pricing trend in Missouri to be similar to other States, with prices becoming lower (potentially significantly) as more licensees become operational and supplies increased.

Indeed, materials in the rulemaking record suggested that the price of legally produced medical marijuana in Missouri could become *too low*, thereby creating risks of substantial diversion of marijuana to the black market. The Haslag study predicted that, due to the excess supply of marijuana which would result from licensing at least sixty cultivation facilities as constitutionally mandated, "the price of medical marijuana will begin to decline because of the excess [supply]." The study stated that these reduced prices would create greater incentives to divert marijuana to the illegal marketplace, where greater profits could be earned. The Haslag study advised that, "[i]n order to keep the legal market functioning without leakages, the price of medical marijuana must be close to the price of illegal recreational marijuana." The study dubbed the ideal price range "the Goldilocks zone: not too low so as to induce participants to opt for the extraordinary marginal gains from the illegal recreational market, and not too high so that low-income qualified patients can afford the treatment." It is not accurate to contend that pricing issues were not considered during the rulemaking process.

Because the Department's license limitations bear a rational relationship to legitimate state interests, the regulations are not arbitrary or capricious, as suggested by Appellants. *Psychiatric Healthcare*, 100 S.W.3d at 900. It cannot be said that the Department failed to "examine the relevant data and articulate a satisfactory explanation for" its decisions. *State Farm*, 463 U.S. at 43. The Departments license limitations are not "willful" or "unreason[ed]," or completely without consideration of important factors. There is sufficient evidence in the record detailing the Department's research and deliberation concerning the competing interests implicated in regulating the medical marijuana industry. Appellants have not provided any "weighty reasons" to overturn the Department's presumptively valid regulations.

Points I, III, and IV are denied.[1]

## II.

In their second Point, Appellants argue that the Department's license limitations violate their right to engage in agricultural activities, as protected under the "Right to Farm" amendment codified in Article I, § 35 of the Missouri Constitution. Section 35 provides

> [t]hat agriculture which provides food, energy, health benefits, and security is the foundation and stabilizing force of Missouri's economy. To protect this vital sector of Missouri's economy, the right of farmers and ranchers to engage in farming and ranching practices shall be

---

[1] Article XIV, § 1.3(25) provides that "[t]he department shall not have the authority to apply or enforce any rule or regulation that would impose an undue burden on any one or more licensees or certificate holders, any qualifying patients, or act to undermine the purposes of this section." Similarly, Article XIV, § 1.3(1)(h) provides that "[t]he department shall lift or ease any limit on the number of licensees or certificate holders in order to meet the demand for marijuana for medical use by qualifying patients." As explained in the text, in this appeal the Appellants have challenged the validity of the numerical license limitations in the Department's regulations, not the manner in which the Department has implemented its licensing program. Nothing in this opinion should be read to foreclose a future claim that the Department's application or enforcement of its rules unduly burdens licensees or patients, or that an easing of the license limitations is necessary to meet patient demand.

20

forever guaranteed in this state, subject to duly authorized powers, if any, conferred by article VI of the Constitution of Missouri.

Prior to the adoption of Article XIV, the Supreme Court determined that the Right to Farm amendment did not apply to the cultivation of marijuana. *State v. Shanklin*, 534 S.W.3d 240, 242 (Mo. 2017). The Court noted that "marijuana cultivation, possession, and distribution had been illegal in Missouri for decades" before the adoption of the Right to Farm amendment. *Id.* at 243. Given this long history of marijuana prohibition, the Court held that a criminal defendant's "marijuana cultivation operations was not a farming practice to be protected" by Article I, § 35. *Id.* "[B]ecause the amendment expressly recognizes farming . . . practices are subject to local government regulation, it would be absurd to conclude Missouri voters intended to implicitly nullify or curtail state and federal regulatory authority over the illegal drug trade." *Id.*

The circuit court determined that "in spite of Missouri's adoption of art. XIV, [marijuana] is still a schedule I controlled substance pursuant to 21 U.S.C. § 812." The court accordingly concluded that, because of its continuing illegality under federal law, the medical marijuana-related activities authorized by Article XIV could not be considered the sort of "farming and ranching practices" which the Right to Farm amendment was meant to protect. We agree.

Even if the Right to Farm amendment provided some level of constitutional protection for medical marijuana-related activities, this still would not render the Department's license limitations unconstitutional. As discussed in § I, above, Article XIV, §§ 1.3(15) through (17) expressly authorize the Department to limit the total number of medical marijuana facility licenses it will issue. As the provision "passed last in time," Article XIV would prevail over the Right to Farm amendment even if there were come conflict between these amendments. *Spradlin v. City of Fulton*, 924 S.W.2d 259, 264 (Mo. 1996). We will not interpret the Right to Farm

21

amendment to limit the regulatory authority expressly given to the Department under a separate, more recently adopted provision of the Constitution. *Cf. Hill v. Mo. Dep't of Conservation*, 550 S.W.3d 463, 473 (Mo. 2018) ("nothing in the language of article I, section 35, suggests it was intended to limit the [Missouri Conservation] Commission's constitutional authority under article IV, section 40(a), to regulate Respondents' captive [deer and elk herds] as 'wildlife' and 'game' resources of this state").

Point II is denied.

## Conclusion

The Department's regulations setting limits on the number of licensed medical marijuana-related facilities are consistent with, and expressly authorized by, the plain language of Article XIV. Appellants have failed to demonstrate that those regulations are arbitrary or capricious, or that they lack a rational relationship to the important governmental interests of ensuring reasonable patient access to medical marijuana, preventing criminal trafficking in marijuana for non-medical uses, and ensuring the health and safety of Missourians. The Right to Farm amendment found in Article I, § 35 of the Missouri Constitution does not invalidate the Department's otherwise lawful rules. The judgment of the circuit court is affirmed.

_____
Alok Ahuja, Judge

All concur.